**AMERICAN FRIENDS SERVICE COMMITTEE, et al.**

v.

**William H. WEBSTER, Director, Federal Bureau of Investigation, et al., Appellants. (Three cases).**

**Nos. 81–1735, 81–1980 and 83–1025.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 25, 1983.

Decided Sept. 30, 1983.

Marc Johnston, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Leonard Schaitman and Michael L. Paup, Attys. Dept. of Justice, Washington, D.C., were on the brief for appellants. Mark Mutterperl and Stephen Gray, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellants.

Marshall Perlin, New York City, for appellees.

Vern Countryman, Cambridge, was on the brief for amicus curiae, Scholars and Citizens for Freedom of Information, in 81–1735 and 81–1980 urging affirmance.

Before WALD and GINSBURG, Circuit Judges, and VAN PELT,* Senior District Judge, United States District Court for the District of Nebraska.

Opinion for the Court in Parts I–V filed by Circuit Judge WALD.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

**34**

Opinion for the Court in Part VI filed by Circuit Judge GINSBURG.

Concurring opinion filed by Senior District Judge VAN PELT.

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. THE DISTRICT COURT PROCEEDINGS | 35 |
| II. THE STATUTORY FRAMEWORK | 36 |
| III. JURISDICTION | 38 |
| A. District Court Findings | 38 |
| B. The Government's Contentions | 38 |
| C. Analysis of Jurisdiction to Review | 39 |
| 1. Exceptions from Judicial Review | 39 |
| 2. The Effect of *Kissinger* on Reviewability | 40 |
| 3. Reviewability of the Agency Actions in this Case | 41 |
| 4. Conclusion | 45 |
| IV. STANDING | 45 |
| A. District Court Findings | 45 |
| B. The Government's Contentions | 47 |
| C. Analysis of Standing | 49 |
| 1. The "Zone of Interests" Test | 49 |
| 2. The Effect of *Kissinger* on Plaintiffs' Standing | 52 |
| 3. The "Zone" Reflected in the Statutory Language | 53 |
| 4. The "Zone" Reflected in the Legislative History | 55 |
| 5. Conclusion | 57 |
| V. COMPLIANCE WITH THE DISPOSAL LAWS | 57 |
| A. District Court Findings | 57 |
| B. The Government's Contentions | 59 |
| C. Analysis of Alleged Disposal Violations | 60 |
| 1. Scope of Review | 60 |
| 2. Statutory Responsibilities | 60 |
| 3. Review of Agency Action | 64 |
| a. The 1975 and 1976 Schedules | 64 |
| b. The 1977 Schedule | 67 |
| 4. Conclusion | 68 |

| | Page |
|---|---|
| VI. RESTRICTED USE RECORDS | 69 |
| A. The Relevant NARS Function | 70 |
| B. The Relevant Laws Restricting Use of Records | 70 |
| 1. Tax Returns and Tax Return Information | 70 |
| 2. Grand Jury Materials | 71 |
| 3. Electronic Surveillance (Title III) Materials | 72 |
| C. The Meaning of Section 2906 | 73 |
| D. Conclusion | 77 |

WALD, Circuit Judge:

These consolidated appeals challenge orders of the district court enjoining the disposal of records by the Federal Bureau of Investigation ("FBI") and directing the National Archives and Records Service ("Archives" or "NARS") and the FBI jointly to develop a detailed records retention plan and records disposal schedules.[1] Appellants are the Attorney General, the Director of the FBI, the Administrator of the General Services Administration ("GSA"), the Archivist of the United States, and various other officials of the FBI and NARS.[2] Appellees are individuals and organizations that claim that the FBI's records destruction program violates various laws and interferes with their rights to, and interests in, access to FBI records. We find that: (1) appellees may state their claim under the Administrative Procedure Act ("APA") because the records disposal statutes do not preclude judicial review by committing their implementation to agency discretion; (2) at least some appellees in this case have standing under the records disposal statutes and are arguably within the zone of interests protected by those statutes; (3) the district court correctly found that the FBI and NARS failed to carry out their statutory responsibilities in developing and approving the 1975 and 1976 records disposal schedules for FBI field office files; (4) the

---

1. Specifically, this case resolves appeals from three orders of the district court, dated June 9, and July 1, 1981 (Nos. 81–1735, 81–1980), and October 20, 1982 (No. 83–1025). The July 1, 1981 order made the January 10, 1980 injunction (as amended) permanent. These orders are explained in greater detail in Part I of this opinion, which discusses the district court proceedings.

2. In discussing appellants' arguments, we will refer to appellants as the government. In discussing statutory responsibilities, we will use GSA and NARS interchangeably because the Administrator of GSA generally has delegated his authority and responsibilities under the records management and disposal laws to the Archivist, who heads NARS. *See* Government's Opening Brief at 4, 7 n. 5 (citing GSA, Delegations of Authority Manual ADM P 5450.39A).

district court was only in part correct that the 1977 records disposal schedule for FBI headquarters files was in violation of the records laws; and (5) the district court lacked authority to order a NARS records management inspection of three categories of restricted use records—tax returns and return information, grand jury materials, and electronic surveillance materials.

## I. THE DISTRICT COURT PROCEEDINGS

Appellees initiated this action on June 26, 1979, alleging that the FBI and NARS had ignored for many years the statutes regulating the management and disposal of federal records. Appellees sought both to enjoin the FBI from destroying its records and to make the FBI's files into permanent records retained by the National Archives. On January 10, 1980, after reviewing "[v]oluminous memoranda and other documents" and conducting an evidentiary hearing, the district court, per the Honorable Harold Greene, issued a preliminary injunction halting destruction of FBI records. *American Friends Service Committee v. Webster,* 485 F.Supp. 222, 225, 236 (D.D.C. 1980). The district court also ordered NARS to develop an FBI records retention plan that met the statutory standards discussed in its opinion and ordered the FBI to formulate records control schedules consistent with that plan. *Id.* at 236. The court stated that it would lift the injunction upon its approval of the plan and schedules. *Id.* The government did not appeal this order.

The government subsequently requested exemptions from the ban on destruction for certain classes of records. In orders dated February 20, April 3, and April 22, 1980, the district court granted the government's motions in part and denied them in part, amending the preliminary injunction accordingly.[3] The government filed a notice of appeal from the district court's orders of April 3, and April 22, 1980, but subsequently dismissed the appeal voluntarily. On April 15, 1980, the government sought unsuccessfully to dissolve the district court's preliminary injunction for lack of standing—relying on the Supreme Court's recent decision in *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). *See American Friends Service Committee v. Webster,* 494 F.Supp. 803 (D.D.C.1980). The government did not appeal the district court's denial of its motion.

In February 1981, more than a year after the district court imposed the preliminary injunction, the court called a hearing to review the government's apparent lack of progress in developing and submitting to the court for approval the records retention plan and records control schedules. In a memorandum opinion and order of June 9, 1981, the district court concluded:

> that no significant action had been taken to carry out the Court's mandate; that the government had no legitimate excuse for its failure to act; and that, except for vague and indefinite plans, no implementing action was being undertaken.

*American Friends Service Committee v. Webster,* No. 79–1655, mem. op. at 3–4 (D.D.C. June 9, 1981) (footnote omitted), *reprinted in* Appendix ("App.") at 39, 41– 42. In light of this recalcitrance, the district court set forth detailed remedial procedures in its order "to insure compliance with the laws enacted by the Congress and with its own orders." *See* App. at 42, 52– 56. The procedural requirements included substantial standard-setting and record examination roles for NARS personnel, who were to receive "full and complete access to all of the files and records of the FBI covered by the [January 10, 1980 order]." App. at 53–55. The "bottom line" of the court's order was for NARS:

> to submit a recommended retention plan to the FBI by September 28, 1981, [for] the FBI . . . to submit a records disposi-

---

3. *See, e.g., American Friends Service Committee v. Webster,* No. 79–1655 (D.D.C. filed Feb. 20, 1980), *reprinted in* Appendix ("App.") at 26–30 (excluding from the scope of the injunction National Crime Information Center entries, certain fingerprint cards, and certain materials required to be destroyed by court order, and ordering the parties to submit additional information on other requests for exclusions).

tion schedule based on that plan by October 16, 1981, and [for] both agencies . . . [to] file with the Court detailed retention plans and disposition schedules by November 9, 1981.

App. at 46, 55. On July 1, 1981, the district court issued an order that made the January 10, 1980 injunction (as amended) permanent.[4] Our decision today reviews the government's appeals of the district court's orders of June 9, and July 1, 1981.

Subsequent orders of the district court dealt in piece-meal fashion with government motions to bar NARS from inspecting certain restricted documents and to permit the FBI to dispose of some other limited categories of materials.[5] These proceedings culminated in the district court's October 20, 1982 memorandum opinion and order, which in large part denied the government's motions to bar inspections by NARS. The government appeals the October 20, 1982 order, which we also review today. *See American Friends Service Committee v. Webster,* No. 79–1655 (D.D.C. filed Oct. 20, 1982), *reprinted in* Joint Supplemental Appendix ("J.S.A.") at 62–78.

While these appeals have been pending, NARS and the FBI have gone forward under the district court's order with their preparation of a new FBI records plan and new disposal schedules. The government submitted its records disposal proposal in November 1981, appellees responded in October 1982, and the government replied in February 1983. To date, the district court has not decided whether the government's proposal for FBI records preservation and disposal is adequate and should be put into effect.

## II. The Statutory Framework

The basic laws pertaining to the management, disposal, and archival preservation of federal records are codified at chapters 21 ("Archival Administration"), 29 ("Records Management by Administrator of General Services"), 31 ("Records Management by Federal Agencies"), and 33 ("Disposal of Records") of title 44 of the United States Code.[6] In general, these laws establish a unified system for handling the "life cycle" of federal records—covering their creation, maintenance and use, and eventually their disposal by either destruction or deposit for preservation. Because this case involves allegations of improper destruction of records, our description of the records statutes concentrates on Congress' directives regarding the selection of records for preservation or elimination.[7]

The Archivist of the United States, operating subject to the general direction of the Administrator of GSA, plays a number of key roles under the four records management chapters. The Archivist has a general responsibility to "provide guidance and assistance to Federal agencies with respect to records creation, records maintenance and use, and records disposition."[8] 44 U.S.C. § 2904. He also has a set of more specific duties, including to "promulgate standards, procedures, and guidelines with respect to records management." *Id.* § 2904(2). In particular, this task includes the establishment of "standards for the selective retention of records of continuing value," and

---

4. The government points out that by its own terms the "permanent" injunction would expire when the district court approved a new records retention plan and disposal schedules for the FBI. Government's Opening Brief at 2 n. 2.

5. *See American Friends Service Committee v. Webster,* No. 79–1655 (D.D.C. orders filed July 28, and August 27, 1981, and June 17, 1982), *reprinted in* App. at 59–61, 62–64, 65–66.

6. There are other chapters of title 44 that deal with records management, *see, e.g.,* chapter 22 ("Presidential Records"), but they are not directly relevant here.

7. There are, of course, other objectives of federal records management. These include, for example, "[c]ontrol of the quantity and quality of records produced," 44 U.S.C. § 2902(2); "maintenance of mechanisms of control . . . to prevent the creation of unnecessary records," *id.* § 2902(3); and "[s]implification of . . . processes of records creation and of records maintenance and use," *id.* § 2902(4).

8. The regulations on "Records Management" are at 41 C.F.R. § 101–11 (1982). Those on the "Disposition of Federal Records" are at *id.* § 101–11.4.

assistance to agencies in applying the standards. *Id.* § 2905(a). However, his authority is not limited to instructing agencies in principles of records management; to carry out his mandate, the Archivist or his staff may themselves get down in the trenches (or in this conflict, the file rooms) by exercising their prerogative to "inspect records or records management practices ... of any Federal agency." *Id.* § 2906(a)(1).

In addition, the Archivist plays a major part in the later stages of the records life cycle. He establishes "procedures for the compiling and submitting to him of lists and schedules of records proposed for disposal." *Id.* § 3302(1). And the Archivist also must examine the lists or schedules submitted to him by agencies to determine whether or not any of the records "have sufficient administrative, legal, research, or other value to warrant their continued preservation." *Id.* § 3303a. The chapter 33 procedures prescribe the *exclusive* means by which federal records may be destroyed. *Id.* § 3314.

Finally, the Archivist is in direct charge of the records deposited in the National Archives. This includes, among other tasks, accepting for deposit and, under certain conditions, directing the transfer to the National Archives of federal records that "have sufficient historical or other value to warrant their continued preservation." *Id.* § 2103. Once the records are received by the National Archives, the Archivist is to preserve them and make them available to the citizenry: He is to provide facilities for furnishing records to other agencies and to the public and, in the course of exhibiting the records, he may prepare guides to facilitate their use. *See id.* §§ 2105, 2106, 2901(9).

While the records statutes obviously assign the Archivist the responsibility to orchestrate the records management effort, the heads of the various agencies remain responsible for the performance of their own instrumentalities. Each one is to:

> make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities.

*Id.* § 3101. Each head of an agency is to develop a program for records management, including provision for cooperation with the Archivist "in applying standards, procedures, and techniques." *Id.* § 3102(2). Each agency head is also to "establish safeguards against the removal or loss of records," including making it known that agency records are not to be destroyed except in accordance with *id.* §§ 3301–3314. *Id.* § 3105. The sections in chapter 33 referred to by *id.* § 3105 include the records disposal procedures supervised by the Archivist, as discussed above. *See id.* §§ 3302, 3303, 3303a.

Whether performed by the Archivist or an agency head separately, or by both in tandem, the records management functions are supposed to implement a set of seven objectives listed in *id.* § 2902. We find two of these statutory objectives particularly noteworthy in this case: (1) the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government"; and (2) the "[j]udicious preservation and disposal of records." *Id.* § 2902(1), (5). To give these general goals more specificity, we draw on the district court's summary of the statutory descriptions of categories of records that the government must preserve:

> (1) those which contain "documentation of the organization, functions, policies, decisions, procedures, operations, and essential transactions of an agency" (sections 3101, 3301); (2) those having "sufficient historical or other value to warrant their continued preservation" (section 2103); (3) those which are necessary to protect the financial and legal rights of persons directly affected by an agency's activities (section 3101); and (4) those which have sufficient "administrative, legal, research, or other value to warrant their further preservation" (section 3303).

*American Friends Service Committee v. Webster,* 485 F.Supp. at 228.

### III. JURISDICTION

#### A. District Court Findings

The district court found that review of the challenged official actions taken under the records management and disposal statutes is available under the APA. First, the court properly pointed out that "5 U.S.C. §§ 701, 702, 706, provide that the action of an administrative agency is subject to judicial review *unless* a statute precludes review or the matter is by law committed to agency discretion." *American Friends Service Committee v. Webster,* 485 F.Supp. at 226 (emphasis added) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Second, the court observed that "[n]one of the records management statutes expressly or impliedly precludes review of the actions of either the Archivist or the FBI." 485 F.Supp. at 226. Third, it set out a test from *Overton Park* to determine whether actions are "committed to agency discretion": "Official actions are deemed to be *committed to discretion* when the statutes involved 'are drawn in such broad terms that in a given case there is no law to apply.'" 485 F.Supp. at 226 (quoting *Overton Park,* 401 U.S. at 410, 91 S.Ct. at 820). Finally, it explained that because "[t]he records management laws contain specific standards and directives with respect to record preservation," a number of which we discussed above in Part II, "there clearly is 'law to apply.'" 485 F.Supp. at 226. Therefore, the district court concluded:

> review is available under the Administrative Procedure Act to determine whether the official actions were arbitrary or capricious, constituted an abuse of discretion, or failed to meet statutory or procedural requirements, and the Court has jurisdiction under 28 U.S.C. § 1331.

*Id.*

#### B. The Government's Contentions

The government's challenge to federal court jurisdiction is based on the exception from judicial review for agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). While the government admits that "a statute should not be 'lightly interpret[ed] . . . to confer an unreviewable power,'" it also asserts that "'the ultimate analysis is always one of Congress' intent.'" Government's Opening Brief at 39 (quoting *Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979)). The government contends that three characteristics of the records management and disposal statutes reveal Congress' intent to leave their implementation to the agencies' discretion, without judicial review: (1) "the nature of the responsibility that has been delegated by Congress"; (2) "the terms of the delegation"; and (3) "Congress' retention of a direct oversight role." Government's Opening Brief at 39–40.

In brief, the government's contentions on the nature of Congress' delegation of responsibility rely heavily on the Supreme Court's comments about the records management statutes in *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). *Kissinger* held that the records management statutes do not create a private right of action to compel parties possessing wrongfully removed agency records to return them to the agency; the Court explained that the only remedy for wrongful removal of records under the records statutes is a suit by the Attorney General under 44 U.S.C. § 3106. *Id.* at 148, 100 S.Ct. at 967. The government acknowledges that *Kissinger* included a footnote, *see* 445 U.S. at 150 n. 5, 100 S.Ct. at 968 n. 5, stating that the Court did not decide what remedies might be available to private plaintiffs bringing an action under the APA against the Attorney General and others for failing to enforce the records statutes because no such action was brought. Government's Opening Brief at 44 n. 30. But it argues nonetheless that an action against the Administrator of GSA and the Attorney General for failure to protect or retrieve records is tantamount to an action calling

for an unreviewable decision not to undertake enforcement action. *Id.*

The government's argument on "the terms of the delegation" corresponds to the *Overton Park* "law to apply" test employed by the district court to find jurisdiction. But the government asserts that the records statutes do *not* provide any "standards by which a court can judge records management and disposal decisions." *Id.* at 41. In particular, the government rejects the "standard" for records disposal in 44 U.S.C. § 3303a—"sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government" —arguing that those words give no guidance to a court. Government's Opening Brief at 41.

The third characteristic signaling unreviewable discretion to the government is Congress' retention of an oversight role for itself in the records disposal process. The government points out that "Congress directly exercised the final power of approval [over records disposal schedules] until 1970." *Id.* at 45 (citing 44 U.S.C. §§ 3304–3307, *repealed by* Act of June 23, 1970, Pub.L. No. 91–287, § 2, 84 Stat. 320, 321–22). While the Administrator of GSA (through the Archivist) now has the final say on disposal, the statutes still maintain "oversight," "consultation," and "mediation" roles for Congress. Government's Opening Brief at 45–46 (citing, *inter alia,* 44 U.S.C. § 3303a(c), (f)).

Finally, the government states that "[t]he fundamental issue presented by plaintiffs' claim[,] is who shall make records management and disposal decisions for the federal government." Government's Opening Brief at 40. Our analysis, however, identifies the key issue to be whether Congress intended to foreclose even limited APA judicial review over records disposal actions of an agency or NARS that allegedly violate the records management and disposal statutes.

It is in that context that we now proceed to consider the government's contentions.

### C. Analysis of Jurisdiction to Review

#### 1. Exceptions from Judicial Review

The Supreme Court has traditionally not been sympathetic to arguments that judicial review is not available under the APA. For example, the Court has stressed that the APA's " 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (quoting *Shaughnessy v. Pedreiro,* 349 U.S. 48, 51, 75 S.Ct. 591, 594, 99 L.Ed. 868 (1955)). It has often reiterated that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories,* 387 U.S. at 141, 87 S.Ct. at 1511 (quoting *Rusk v. Cort,* 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962)).[9] And more recently the Court has pointed out that it "will not lightly interpret a statute to confer unreviewable power on an administrative agency." *Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979) (citing *Morris v. Gressette,* 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975)).

The Court has reinforced these general strictures in addressing the particular APA exception pressed by the government here—for "agency action ... committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Court called this a "very narrow exception ... applicable in those rare instances when 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)

---

**9.** *Accord Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 462, 99 S.Ct. 2388, 2398, 60 L.Ed.2d 1017 (1979); *Dunlop v. Bachowski,* 421 U.S. 560, 567–68, 95 S.Ct. 1851, 1857–58, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S.

402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). *But see* K. Davis, *Administrative Law Treatise* § 28.09 (1982 Supp.) (criticizing "clear and convincing evidence" standard and asserting that it is not followed in some Supreme Court holdings that recite it).

(quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)) (footnote and other citation omitted).[10]

While these statements caution that agency action will be reviewable in the vast majority of cases, we must still carefully evaluate the actions and statutes here to see whether that presumption has been overcome. "In practice, the determination of whether there is 'law' to apply necessarily turns on pragmatic considerations as to whether an agency determination is the proper subject of judicial review." *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043 (D.C.Cir.1979) (citations omitted) [hereinafter *NRDC v. SEC*].

### 2. The Effect of Kissinger on Reviewability

■ We first take up the government's suggestion that *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), foreclosed the availability of judicial review in this case. *Kissinger* arose out of FOIA requests that sought access to transcripts of Kissinger's telephone conversations during the periods he served as National Security Adviser and as Secretary of State. Kissinger had removed the relevant transcripts from the State Department's control and deposited them with the Library of Congress (under an agreement with limits on access). *See id.* at 139–42, 100 S.Ct. at 963–64. The Attorney General had not taken action, as he is authorized to

do with GSA's assistance, *see* 44 U.S.C. §§ 2905, 3106, to recover the documents. The Court ruled that the records management statutes did not create a private right of action to compel parties possessing wrongfully removed agency records to return the records to the agency so as to be evaluated under a FOIA request. *See* 445 U.S. at 145–50, 100 S.Ct. at 966–68.[11] The government argues that *Kissinger* necessarily implies that *no* government actions under the records management laws would be subject to APA review.

The government's interpretation of *Kissinger* would of course render meaningless the Court's footnote that explicitly left the question of APA review undecided. *See id.* at 150 n. 5, 100 S.Ct. at 968 n. 5.[12] Equally important, the APA action before us involves an alleged abuse of discretion of a very different kind from the one the *Kissinger* plaintiffs might have raised; the actions here are of a nature that Congress probably intended to be subject to judicial review under the APA. On the *Kissinger* facts, allegations of breach of duty by agency administrators and the Attorney General could have focused only on the agency actions that permitted removal of documents to the Library of Congress and on the Attorney General's decision not to take action to retrieve the documents. This case, on the other hand, involves allegations of unauthorized records *destruction* and is based on the protections of 44 U.S.C. §§ 3101, 3303, 3303a. Moreover, the allegedly illegal

---

10. *Accord Local 1219, Am. Fed'n of Gov't Employees v. Donovan*, 683 F.2d 511, 515 (D.C.Cir. 1982); *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043 (D.C.Cir.1979) [hereinafter *NRDC v. SEC*]. We note, however, that a literal application of the "no law to apply" test provides limited guidance. *See* K. Davis, *supra* n. 9, § 28.16, at 499 (criticizing the test and pointing out that "[d]iscretion which is unguided by law is often more in need of review than discretion in applying law") (emphasis removed). As we explain later, in practice courts have supplemented the test with a more pragmatic analysis of the effects of judicial review on the agency, the plaintiffs, and the courts.

11. The Court assumed for purposes of its decision that Kissinger had wrongfully removed

certain documents. 445 U.S. at 148, 100 S.Ct. at 967. The Court also held that FOIA did not "suppl[y] what was missing from [the records management statutes]—congressional intent to permit private actions to recover records wrongfully removed from Government custody." *Id.* at 150, 100 S.Ct. at 968.

12. The footnote states:
 We need not decide what remedies might be available to private plaintiffs complaining that the administrators and the Attorney General have breached a duty to enforce the Records Act, since no such action was brought here. *See* 5 U.S.C. §§ 704, 701(a)(2), 706(1).
 445 U.S. at 150 n. 5, 100 S.Ct. at 968 n. 5.

destruction is attributed to the very agencies in charge of filing suit to protect the records. In a situation where GSA and the FBI (part of the Justice Department) are the allegedly guilty parties that have agreed to the destruction of the records, it is highly unlikely that Congress intended the exclusive remedy to be a Justice Department suit to recover the records (and to have the remedy triggered by FBI or GSA notification of improper records removal). We therefore conclude that *Kissinger* left open the issue of the availability of judicial review in this situation and that *Kissinger's* facts and rationale do not suggest a finding of no reviewability here.

### 3. Reviewability of the Agency Actions in this Case

In *NRDC v. SEC,* this court identified "three particularly important factors" to guide our analysis of whether Congress definitely intended to commit the implementation of the records disposal laws to agencies' unreviewable discretion: (1) "the need for judicial supervision to safeguard the interests of the plaintiffs"; (2) "the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role"; and (3) "the appropriateness of the issues raised for judicial review." 606 F.2d at 1044 (citation omitted).[13] "Finally," the court concluded, one should "inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review." *Id.*[14]

As to the first factor listed in *NRDC v. SEC,* there is substantial need to safeguard plaintiffs' interests[15] through judicial supervision of FBI and NARS actions under these laws. Day-to-day operating needs will always dictate in large part which records an agency maintains; agency personnel will decide which records are in fact preserved even if they are implementing a plan developed in consultation with archivists. But of course these limits on the perfectability of a records program do not propel us to the conclusion that Congress wanted the agencies and NARS to operate without any review. Congress was certainly aware that agencies, left to themselves, have a built-in incentive to dispose of records relating to "mistakes" or, less nefariously, just do not think about preserving "information necessary to protect the legal and financial rights . . . of persons directly affected by the agency's activities." 44 U.S.C. § 3101. And NARS itself vigorously points out it does not have the resources to check all agency records disposal practices. Given this tension, Congress would probably want a check on NARS' review of the disposal practices of a mammoth, inherently secretive agency like the FBI, whose files contain a great deal of information about the government's treatment of citizens' "legal rights" and will include materials of considerable "administrative, legal, [or] research . . . value." *Id.* §§ 3303, 3303a. Congress almost certainly would have wanted a limited APA review to protect against the possibility of such actions as the improper destruction of

---

**13.** In *Southern Ry.,* the Supreme Court also relied in part on an analysis of the "practical effects of reviewability." 442 U.S. at 457, 99 S.Ct. at 2395. Other circuits, like ours, have sought to structure their analyses of the "practical and policy implications" of reviewability by setting out similar guiding factors. *See American Fed'n of Gov't Employees, Local 2017 v. Brown,* 680 F.2d 722, 725–26 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983); *Bullard v. Webster,* 623 F.2d 1042, 1046 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Local 2855, Am. Fed'n of Gov't Employees v. United States,* 602 F.2d 574, 578–80 (3d Cir.1979). The factors this court listed in *NRDC v. SEC* are especially close to those proposed in Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367, 371 (1968) (Saferstein's factors are: how the demands of review would affect the operations of the agency and its programs; the extent to which review would burden the courts; and whether review could effectively remedy the grievance).

**14.** *Accord Local 1219, Am. Fed'n of Gov't Employees v. Donovan,* 683 F.2d 511, 515 (D.C.Cir. 1982).

**15.** We discuss plaintiffs' interests in more detail in Part IV on standing.

World War II counterintelligence records (because they concern today's allies) or the shredding of documents on the ground that they present unflattering portrayals of the FBI's relations with local law enforcement agencies or informants during the civil rights movement.

Despite the government's arguments that the standards of delegation provide no basis for review, we agree with the district court that there is some "law" to apply.[16] Congress itself developed some guidelines, albeit leaving substantial discretion to the agencies. The records disposal standard of *id.* §§ 3303, 3303a—"sufficient administrative, legal, research, or other value"—originated in the Records Disposal Act of 1943. Pub.L. No. 78–115, §§ 3, 4, 6, 57 Stat. 380, 381. The House Report explained that the new standard was devised to replace an "ambiguous phrase"—"permanent value or historical interest to the Federal Government." H.R.Rep. No. 559, 78th Cong., 1st Sess. 2 (1943). Under the new standard, the House Report noted, the disposal of records warranting preservation would be prevented and the disposal of less valued records would be facilitated. *See id.* at 1.

The Federal Records Act of 1950, in which Congress set out the standard in § 3101 for guiding agency heads on preservation duties, did much more than transfer discretionary authority: While Congress instructed agencies to dispose of useless records, it took care to reemphasize that agencies' new zeal to thin out files must not blind them to the need to preserve information relating to the legal and financial rights of both the government and persons directly affected by it.[17] *See* Pub.L. No.

---

**16.** We note that the government quotes freely from Justice Brennan's separate opinion in *Kissinger* in supposed support of its argument that the records acts offer "no law to apply." The government contends that "[t]he history of this case 'expose[s] how ill-suited a court is' . . . to interfere in the records management and disposal system," and that there is an " 'absence of an analytically satisfying standard for determining *which* records should be retained.' " Government's Opening Brief at 46–47 (quoting *Kissinger,* 445 U.S. at 160, 100 S.Ct. at 973 (Brennan, J., concurring and dissenting) (emphasis by Brennan, J.)).

We find this a twisted reading of Justice Brennan's statement, which dealt with his "uncertainty about the contours of the 'improper withholding' standard" under FOIA. 445 U.S. at 158, 100 S.Ct. at 972. He explained that the public access purpose of FOIA may well mean that agencies "have a . . . responsibility to retain possession of, or control over," "records incorporated into Government decisionmaking." *Id.* at 159, 100 S.Ct. at 973 (citation omitted). But he was unsure "where to draw the line." *Id.* at 160, 100 S.Ct. at 973. Justice Brennan suggested that courts were "ill-suited" for the task of drawing *that line:* Because the "improper withholding" standard failed to clarify *which* records the government should maintain under FOIA, Justice Brennan found that standard "analytically [un]satisfying," not the statutory standards for records preservation and disposal. Indeed, Justice Brennan concluded that to resolve the case at hand, he would accept Justice Stevens' "practicable" approach of relying on "the *record statutes* . . . .[,] which *formulate document retention criteria that are not unduly burdensome and that carry a congressional imprimatur.*" *Id.* at 160–61, 100 S.Ct. at 973–74 (emphasis added). The records criteria that Justice Stevens cited are those of 44 U.S.C. §§ 3303, 3303a, the very sections involved here. *See id.* at 165 n. 7, 100 S.Ct. at 976 n. 7 (Stevens, J., concurring and dissenting).

**17.** The Senate Report on the 1950 legislation admittedly placed a premium on making records management more efficient, reflecting the reality that most agencies were keeping too many records and retaining them in high cost locations. The government quotes a passage that makes this general point:

"It is well to emphasize that records *come into existence,* or should do so, not in order to fill filing cabinets or occupy floor space, or even to satisfy the archival needs of this and future generations, but first of all to serve the administrative and executive purposes of the organization that creates them."

Government's Opening Brief at 32 (quoting S.Rep. No. 2140, 81st Cong., 2d Sess. 4 (1950), U.S.Code Cong.Serv. 1950, p. 3547) (emphasis added).

Nothing we say implies that records should "come into existence . . . to satisfy . . . archival needs." Nor do we doubt that once the records have been created that their prime function is to serve as information sources for public executives. But the plain language of 44 U.S.C. §§ 3101, 3303, 3303a makes clear that Congress wants to preserve some records that agencies have created and that executives have relied on, so that the documents are not lost to history. For whether one prefers Jefferson's optimistic tone—"History, by apprising [persons] of the past, will enable them to judge the future"—or his pessimistic one—"History, in

81–754, § 506(a), 64 Stat. 583, 586. The Federal Records Act of 1950 drew extensively from a task force report of the first "Hoover Commission," *see* U.S. Commission on the Organization of the Executive Branch of the Government, *Task Force Report on Records Management* (1949). That report was greatly concerned with making federal recordkeeping more efficient, but it also stressed that certain categories of records (*e.g.*, of historical interest, concerning legal rights) must be preserved for eventual use by public officials, scholars, and others. *See id.* at 9, 10, 23, 26, 38.

Furthermore, through both regulations and a Records Management Handbook, NARS has announced additional criteria, based on the statutory standards, for appraising records of permanent value. *See* 41 C.F.R. § 101–11.4 (1982); GSA Records Management Handbook, *Disposition of Federal Records* (1978) [hereinafter "NARS Handbook"], *reprinted in* J.S.A. at 587–652.

Congress *required* NARS to establish these "standards for the selective retention of records of continuing value." 44 U.S.C. § 2905; 41 C.F.R. § 101–11.405–1. This requirement is hardly an indicator that Congress was content to leave the records disposal process solely to the agencies' and NARS' discretion.[18] Moreover, the regulations and the NARS Handbook provide additional specifications[19] against which a court may analyze a decision on disposal schedules.[20]

The need to protect plaintiffs' interests through some type of supervision of agency actions under the records disposal laws—along with some evidence that Congress intended to provide standards on what to preserve—does not of course inexorably lead to the conclusion that *judicial review* is called for. Congress may have intended an alternative means of supervi-

---

general, only informs us what bad government is"—records of government action are clearly worth careful review before destruction. T. Jefferson, *Writings*, vol. I at 207, vol. XI at 223. So Congress thought here.

**18.** Congress, of course, may have required NARS to establish standards for disposal because it wanted NARS to exercise its discretion in a principled fashion or because it thought guidelines would make the agencies' tasks easier to perform. However, Congress' insistence on these standards (this is not permissive language authorizing regulations) further limits agency discretion in individual cases and thus cautions against inferring a congressional intent to deny judicial review on the basis that records disposal decisions were "committed to agency discretion."

**19.** For example, the NARS Handbook includes a chapter entitled "The Schedule: Records Values and the Appraisal Process." J.S.A. at 611–17. The chapter starts by dividing records values into those of interest to the agency and those of interest to future researchers and the public. Agency interests are subdivided into administrative, legal, fiscal, and scientific, with brief explanations of each. The interests of researchers and the public are subdivided into evidential and informational values, which are then further categorized and explained (*e.g.*, data on: agency policies, persons, places). *Id.*

**20.** In *Local 2855, Am. Fed'n of Gov't Employees v. United States*, 602 F.2d 574, 580–82 (3d

Cir.1979), the court found the *absence* of regulations providing such criteria to be significant in the course of deciding that the Army's decision to contract out to private parties for services was not reviewable. Neither the statute nor regulations "provide[d] rules or specifications that would permit a court to adjudicate plaintiffs' disagreements with the formulas, factors, and cost projections relied upon by the Army." *Id.* at 582 (footnote omitted).

*Local 2855* involved 5 U.S.C. § 301, which the government seeks to analogize to the records statutes. *See* Government's Opening Brief at 42–43. The government seeks to make this comparison because dictum in *Chrysler Corp. v. Brown*, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979), noted: "Were we simply confronted with the authorization in 5 U.S.C. § 301 to prescribe regulations regarding 'the custody, use, and preservation of [agency] records, papers, and property,' it would be difficult to derive any standards limiting agency conduct which might constitute 'law to apply.'" We do not find, for purposes of analyzing reviewability, that 5 U.S.C. § 301 is similar to the four chapters in title 44 on records management and particularly to 44 U.S.C. §§ 3101, 3303, 3303a. Section 301 does not contain language setting standards; it is a permissive grant of authority to promulgate regulations on administrative matters. The sections we refer to in title 44 do contain standards (supplemented by regulations and the NARS Handbook), and the preservation and disposal actions specified in the laws are mandatory.

sion. The government suggests two. We have already discussed why we think the initiation of an action by the Attorney General is not an option Congress would have relied on to cope with allegations such as those presented here. The government's second counter is that Congress retains a direct oversight role through its review of NARS' reports and its availability to offer advice on difficult choices GSA refers to it. *See* 44 U.S.C. § 3303a(c), (f). We are not persuaded. The government's argument, if accepted, would create an enormous exception to judicial review: Congress exercises oversight over all agencies, gets reports from many, and is often consulted by the executive branch before specific actions are taken. Reliance on congressional supervision to supplant judicial review would run counter to Congress' decisions in 1970 to abolish the Joint Committee on Disposition of Executive Papers and to abandon the perfunctory business of "deciding" on records disposition. *See* Act of June 23, 1970, Pub.L. No. 91–287, 84 Stat. 320; S.Rep. No. 914, 91st Cong., 2d Sess. 2 (1970), U.S.Code Cong. & Admin.News 1978, p. 3297. That legislation, by creating 44 U.S.C. § 3303a, carved out a role for GSA (or NARS) to work with agencies on records disposal practices. It is the exercise of that role that appellees now question under the limits of APA review.

To sum up our evaluation of *NRDC v. SEC's* first factor, we conclude there is a practical need for supervision of the FBI's and NARS' actions under the records disposal laws in order to protect plaintiffs' interests. Furthermore, Congress passed statutory language that provides some guidance on which records are to be preserved, so it is possible to review the FBI's and NARS' performance. Finally, Congress gave up formal responsibility for deciding on records disposal plans and delegated that authority to NARS.

The second factor proposed in *NRDC v. SEC* is "the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role." 606 F.2d at 1044. The government worries about the demands that may be placed on a small NARS staff. This is a strange argument for the government to put forward because the allegations in this case do not aim at some tangential NARS responsibility, the discharge of which will undermine NARS' execution of its key mission. NARS' performance of its duties in the records disposal process is at the *heart* of NARS' reason for existence. We are not impressed with the argument that since NARS' staff is too small to carry out its statutory duties effectively, we should not bother it with review. On the other hand, the FBI's prime mission is not in the nature of archival and recordkeeping work. But the government has not maintained that the FBI's performance of its core assignments would be hindered by our review. The FBI has, in fact, already developed a detailed internal recordkeeping system (with about 200 basic filing classifications), which serves a valuable support function for its enforcement work and which could provide the structure for disposal schedules.

We recognize, however, that the district court nudged NARS to dig deeply and with considerable effort into the FBI's recordkeeping practices in this case. We expect that this experience will turn out to have been an extraordinary one for NARS. First, as we will explain further in Part V.C.2, we do not agree with the district court that all these duties are required (*e.g.,* inspection under 44 U.S.C. § 2906) absent a finding of NARS' abuse of its discretion. Second, we believe that it is reasonable that NARS may have to spend more resources developing and checking records plans for agencies whose files are especially likely to contain significant information pertaining to legal rights and topics of particular interest to historical researchers. Third, once NARS devises a records disposal plan with an agency and implements it, there is no reason to expect that the task would have to be repeated very often.

Finally, we believe that the papers NARS and an agency prepare in the course of reaching records disposal decisions should make their actions easily reviewable with little or no extra work for them. The re-

cordkeeping agency's object is to draft records schedules that explain which categories of records will be disposed of and why. The agency must include a reasoned explanation so that NARS can evaluate the disposal schedules under 44 U.S.C. § 3303a. The final schedules must also include enough guiding detail to instruct the agency personnel who will implement it. These papers should provide the record basis of a court's review.

■ The third factor proposed in *NRDC v. SEC* is whether the issues are appropriate for judicial review. As noted, it is likely that the records disposal planning process will suitably frame the issues for judicial consideration. It is true that the preparation of records disposal schedules, as parts of a large records system, will involve deliberations about managerial and efficiency concerns. NARS' tasks also require archival expertise. But we are not being asked to review the FBI's management information systems or its cost analyses on how to perform the records preservation job most efficiently.[21] Nor are we called upon to second-guess NARS' reasoned judgment to dispose of certain types of records within specific categories pertaining to historical research or legal rights—such as the FBI's campaign against organized crime. We can and should, however, review records disposal plans to determine if there is a rational basis for the FBI's and NARS' decisions on how to deal with files of such obvious interest. Judges are not novices on matters such as whether records have administrative, legal, or research value, or whether records are necessary to protect the legal and financial rights of persons directly affected by an agency's acts, *see* 44 U.S.C. §§ 3101, 3303a; we are certainly competent

to review the FBI's and NARS' records disposal plans for abuse of discretion or an unreasonable explanation. *See* 5 U.S.C. § 706(2)(A).[22]

### 4. *Conclusion*

Our analysis of these three factors leads us to conclude that "the considerations in favor of nonreviewability ... are [not] sufficiently compelling to rebut the strong presumption of judicial review." *NRDC v. SEC*, 606 F.2d at 1044. Judicial review in this case supplies an important need by ensuring that NARS and the FBI did not overlook plaintiffs' interests when applying the statutory standards on records disposal and preservation. Second, our review should enhance rather than hinder NARS' performance, without burdening the FBI. And third, the examination will involve issues within our competence. In the course of this analysis we have discussed and refuted the government's three main arguments against reviewability: (1) that in *Kissinger* the Supreme Court implied that Congress delegated unreviewable discretion to the agencies to destroy their records; (2) that the terms of Congress' delegation provide no "law to apply"; and (3) that Congress' retention of an oversight role substitutes for judicial review of records destruction decisions. We stress, however, that we have measured Congress' intent with a focus on the records preservation and disposal decisions under these statutes. Our action here does not address judicial review of other agency decisions on recordkeeping.

## IV. STANDING

### A. *District Court Findings*

The district court addressed the standing issue both before and after the Supreme

---

**21.** This "practical" consideration provides another distinguishing factor between the facts of this case and actions involving "economic projections and cost analyses, at least when the agency has broad leeway to devise the formula to be applied ... and when there are no discernable guidelines." *Local 2855, Am. Fed'n of Gov't Employees v. United States,* 602 F.2d at 579 (Army's decision to contract for services not reviewable). *See also American Fed'n of Gov't Employees, Local 2017 v. Brown,* 680 F.2d 722 (11th Cir.1982) (same), *cert. denied,*

—— U.S. ——, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983).

**22.** *Cf. Driscoll v. Edison Light & Power Co.,* 307 U.S. 104, 122, 59 S.Ct. 715, 724, 83 L.Ed. 1134 (1939) (Frankfurter, J., concurring) (courts should avoid review of a determination that "does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment").

Court's decision in *Kissinger*. In its first opinion, the court set out a two-part standing test, which required:

(1) a case or controversy ..., that is, if the parties have a sufficiently personal stake ... and ... have suffered injury in fact, and (2) ... a fairly traceable causal connection between the claimed injury and the challenged conduct, such as where the claims asserted are within the zone of interests protected or regulated by the statutes involved.

*American Friends Service Committee v. Webster*, 485 F.Supp. at 226 (footnote omitted).

Next the court divided the plaintiffs into three categories so as to focus more sharply its application of the standing test. The first group included "individuals and organizations whose claimed need for FBI documents arises out of their professions as historians, journalists, teachers, film writers, or attorneys." *Id.* This group had in the past made FOIA requests for FBI documents (which allegedly were destroyed notwithstanding the requests), had other requests pending, and intended to request FBI files in the future. Since the plaintiffs needed the documents for their professional research, the court found that continued records destruction would lead to "concrete and personal damage" to their careers. The court explained that the damage may take the form of economic harm, but at a minimum would be "equivalent to the type of non-economic [aesthetic or environmental] injury recognized ... in *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 [ (1972) ]." 485 F.Supp. at 226–27 (footnote omitted).

The second group of plaintiffs consisted of "individuals who, as subjects of FBI investigations or alleged victims of FBI activities, claim to have suffered legal wrongs." *Id.* at 226. The court said that these plaintiffs, who also had requested or intended to request FBI files, had an interest in preserving possible documentary "evidence

necessary for legal action to remedy these alleged wrongs." *Id.* at 227. Their "stake in this action," their harm, is "an inability to obtain the FBI documents relating to their particular claims." *Id.*

The third category of plaintiffs included organizations that sought to further "civil liberties; civil rights; social, cultural, and economic change; and world peace." *Id.* (footnote omitted). These plaintiffs argued that the destruction of FBI files deprived them of primary research materials, from which they could glean and disseminate information for organizational, educational, and political purposes. The court stated that this asserted injury was more questionable. The court concluded, however, that "the plaintiffs in the other groups have adequately shown injury for standing purposes," so that it need not decide if the organizations in the third category had failed to do so. *Id.*[23]

The district court found that all the plaintiffs "satisf[ied] the second prong of the standing test," including the "zone of interests" requirement:

[T]he various laws here involved govern the creation, preservation, maintenance, and disposal of federal records. These laws are designed primarily for the orderly management of government files, but among their other important purposes is the preservation of documents which may be of use to private citizens.

*Id.*

The district court's second opinion on standing responded to a government motion arguing that the intervening *Kissinger* decision "destroy[ed] plaintiffs' standing to sue" by undermining the district court's conclusion that the plaintiffs were "arguably" within the "zone of interests" of the records management statutes. *American Friends Service Committee v. Webster*, 494 F.Supp. 803, 804–05 (D.D.C.1980). A footnote to the district court's opinion ably summarizes most of the distinctions between *Kissinger* and this case:

---

**23.** Since the district court based its finding of standing only on the injuries shown by the first two groups of plaintiffs and appellees did not

cross-appeal that aspect of the decision, our review considers only the standing of those two groups.

[O]ne cannot conclude that ... because parties may not have a legally-cognizable interest [a private right of action] in the direct recovery of records which governmental authorities have permitted a private person to take, they also lack an interest, sufficient for standing purposes, in preventing government itself to destroy records which under the terms of the law it is required to retain.

494 F.Supp. at 806 n. 8 (citing *Kissinger,* 445 U.S. at 150 n. 5, 100 S.Ct. at 968 n. 5). Furthermore, the district court pointed out that *Kissinger's* footnote five left open "the issue whether private parties might have a remedy [through an APA action] in the event the agency heads and the Attorney General breach their duty to enforce the Records Act against unauthorized removals by private parties." 494 F.Supp. at 805–06 (footnote omitted). Reasoning that it would have been illogical for *Kissinger* to have left the issue of this APA remedy open at the same time it foreclosed standing to bring the APA action, the district court concluded that *Kissinger* should not be read to imply that the zone of interests of the records laws does not encompass plaintiffs injured by such an alleged breach of duty. *Id.*

### B. The Government's Contentions

The government's argument on standing does not question plaintiffs' injury in fact.[24] Instead, the government relies solely on a challenge to the district court's finding that the plaintiffs are "not within the zone of interests protected or benefited by the federal records management and disposal laws." Government's Opening Brief at 30. The government points out that "[s]atisfaction of the zone of interests component of the standing inquiry requires some indicia that the litigant's particular interest was *intended* to be protected, benefited, or regulated by the statute upon which the litigant's claim is based." *Id.* (emphasis in original) (citing *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951 (D.C.Cir.1982); *Control Data Corp. v. Baldrige,* 655 F.2d 283 (D.C. Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981)). The government maintains that the plaintiffs cannot meet the "zone of interests" test because (1) "the language," (2) "the legislative history," and (3) "the structure of the federal records management and disposal laws confirm that 'their purpose was not to benefit private parties, but solely to benefit the agencies themselves and the Federal Government as a whole.'" Government's Opening Brief at 38 (quoting *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. at 149, 100 S.Ct. at 968).

As for statutory language, the government quotes the purpose of the records management and disposal laws—"to require the establishment of standards and procedures to assure efficient and effective records management," 44 U.S.C. § 2902—and contends that this statement reveals that "[t]he laws ... are 'housekeeping' statutes passed solely for the government's own benefit." Government's Opening Brief at 31–

---

24. The government's opening and reply briefs dealt solely with the "zone of interests" standing argument. In response to a question from the court during oral argument, the government stated that it was not challenging the finding of injury in fact or the causal connection between the action and the injury. Even though the government does not contest these other standing requirements, since the issue is a jurisdictional one we note our agreement with the district court's findings on those requisites. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–60, 70 L.Ed.2d 700 (1982) (explaining the three constitutional requirements and the three prudential principles). We recently explained the relationship of these various tests to one another:

> The standing inquiry focuses on the substance of the agency action, its adverse impact on the plaintiff, and the types of interests that the applicable law is designed to protect. The would-be plaintiff's interest in the relevant law is ascertained by injury in fact; the law's interest in the would-be plaintiff is determined by the "zone of interests" test. Mutuality of interest must be credibly asserted.

*Capital Legal Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 259 (D.C.Cir.1983).

32 (footnote omitted).[25] In addition, the government argues that "[t]hose provisions in the records management and disposal laws that set criteria for preservation and disposal of government records do not include possible public interest in such records among their criteria." *Id.* at 33 (citing 44 U.S.C. § 2905(a) ("selective retention of records of continuing value"); *id.* § 3303a(a) ("sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government")).

The legislative history, the government explains, reinforces these two points. It cites a passage from the Senate Report on the Federal Records Act of 1950 that states that records come into existence first of all to serve administrative purposes[26] as evidence that the records statutes' *only* purpose is to increase the usefulness of records for agency executives. *See* Government's Opening Brief at 32. The government also contends that the records disposal criteria in §§ 3303, 3303a, which Congress first laid out in the Records Disposal Act of 1943, Pub.L. No. 78–115, §§ 3, 4, 6, 57 Stat. 380, 381, only clarified the prior standard, which referred to records of "permanent value or historical *interest to the Federal Government.*" Records Disposal Act of 1939, Pub.L. No. 76–295, §§ 3–5, 53 Stat. 1219, 1220 (emphasis added). Thus, the standard of §§ 3303, 3303a is supposedly only concerned with the *government's* interest in records. Finally, the government reminds us that the 1943 legislation, "like every major piece of modern federal records management and disposal legislation[,] ... was meant to facilitate, not retard, disposition of government records." Government's Opening Brief at 33–35 (footnote and citations omitted).

The government tries to erect a Chinese wall between plaintiffs' interests in this case and parts of the records statutes that it admits do indicate "that members of the public might have an interest in government records." *Id.* at 35. The first of these references to the public interest is in 44 U.S.C. § 3101, which requires the "head of each Federal agency" to "make and preserve records containing adequate and proper documentation ... designed to furnish the information necessary to protect the legal and financial rights ... of persons directly affected by the agency's activities." The government strains to isolate § 3101 from plaintiffs' interests in records disposal by arguing that § 3101 imposes a duty on the FBI, not NARS or GSA, and therefore the section "does not limit the [GSA] Administrator's authority to approve disposal of agency records [in accord with § 3303a]." Government's Opening Brief at 36–37. In addition, the government suggests that § 3101 does not establish an interest for plaintiffs in the records because the section leaves the FBI discretion to determine what documentation is "adequate." Government's Opening Brief at 36.

The government considers the second reference to the public—in 44 U.S.C. § 2106 and § 2901(9), which together require the Administrator to provide facilities for furnishing National Archives records (or information from them) to the public—to be "[t]he only recognition of possible general public interest in federal records ... found in the records management and disposal laws." Government's Opening Brief at 37. It argues that these sections do not provide evidence that the "zone of interests" of the records laws encompasses the plaintiffs' interests because this dispute does not involve the records in the Archives. Even if it did, the government continues, the statutes only require the Archives to make information (not records) available, and the Administrator has discretion to decide which Archives

---

**25.** Section 2902 lists seven "goals" "to implement" in order to serve the purpose quoted in the text. Two of these goals, as we explained in Part II, are the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," and the "[j]udicious preservation and disposal of records."

44 U.S.C. § 2902(1), (5). We believe "effective records management," as called for in the purpose of § 2902, includes the achievement of these "non-housekeeping" goals.

**26.** *See* n. 17, *supra.*

information services to offer the public. Government's Opening Brief at 37–38.

## C. Analysis of Standing

### 1. The "Zone of Interests" Test

To summarize, the government's sole argument on standing is that the plaintiffs have not asserted injury to an interest "arguably" within the "zone of interests" protected or regulated by the records management and disposal statutes. We approach the "zone" test with some trepidation. This court has lamented on a number of occasions that the test is amorphous and confusing.[27] Our perplexity is not unique; the absence of a clear explanation of the "zone" test by the Supreme Court has led other federal courts to apply the test in divergent fashion.[28] There certainly has been no dearth of critics of the test,[29] one of whom has even pronounced it "extinct"[30]—a bit precipitously. The Supreme Court recently restated, in dicta, that the "zone" test remains one of the "prudential principles that bear[s] on the question of standing." *Val-ley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).[31] Therefore, we must endeavor again to make sense of the test.

The Supreme Court introduced the "zone of interests" test in four cases decided in 1970 and 1971.[32] The spirit that motivated the test was "the trend . . . toward enlargement of the class of people who may protest administrative action." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The Court stated that this new test stood in the place of the eroded requirement that a party must have a "legal interest"[33] in the agency action under challenge. *See id.* at 153, 90 S.Ct. at 829. And in all four cases the Court found that the litigants met the new "zone" test. Unfortunately, the Court's explanation of how the "zone" test should be applied was cursory, and the conclusory nature of its own application was not elucidating.[34]

27. *See, e.g., Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951, 953–55 (D.C.Cir.1982) (Ginsburg, J., concurring in the result) (requesting clarification from the Supreme Court); *Control Data Corp. v. Baldrige,* 655 F.2d 283, 289, 297 (D.C. Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981).

28. We pointed out in *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130 (D.C.Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), that:

 [s]ome courts have chosen to ignore the zone test; at least one circuit court has chosen forthrightly to state its opposition to the test. Perhaps the most common pattern is to announce in conclusory terms that the zone standard has or has not been satisfied.

 *Id.* at 139 (footnotes omitted).

29. *See, e.g., Barlow v. Collins,* 397 U.S. 159, 167–70, 90 S.Ct. 832, 838–39, 25 L.Ed.2d 192 (1970) (Brennan, J., joined by White, J., concurring in the result and dissenting); 4 K. Davis, *Administrative Law Treatise* § 24.17 (2d ed. 1983).

30. Davis, *Standing, 1976,* 72 Nw.U.L.Rev. 69, 81 (1977).

31. *See also Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100 n. 6, 99 S.Ct. 1601, 1608 n. 6, 60 L.Ed.2d 66 (1979) (noting that "[t]here are other nonconstitutional limitations on standing" and giving the "zone of interests" test as an example).

32. *See Investment Co. Inst. v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

33. *See Tennessee Elec. Power Co. v. TVA,* 306 U.S. 118, 137–38, 59 S.Ct. 366, 369–370, 83 L.Ed. 543 (1939). Professor Stewart discusses the dilution of the "legal interest" test in *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1723–34 (1975).

34. The Court's subsequent actions have not provided refinement. It employed the "zone" test as a basis for decision in one other case, *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 320 n. 3, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977) (stock exchanges in states other than New York had standing to challenge New York State's securities transaction tax, in part because their challenge was "'arguably within the zone of interests to be protected'" by the Commerce Clause) (quoting *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829). In

Moreover, two members of the Court asserted that the prudential "zone" test was not necessary; they believed that the "injury in fact" test for standing was sufficient. *Barlow v. Collins,* 397 U.S. 159, 167–70, 90 S.Ct. 832, 838–39, 25 L.Ed.2d 192 (1970) (Brennan, J., joined by White, J., concurring in the result and dissenting).[35]

■ This court, like others, has struggled to "mak[e] a principled application of [the 'zone'] standard." *Control Data Corp. v. Baldrige,* 655 F.2d 283, 293 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). We have concluded that a court applying the "zone" test "must discern whether the interest asserted by a party in the particular instance is one intended by Congress to be protected or regulated by the statute under which suit is brought." *Id.* at 293–94 (footnote omitted)[36] (citing *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183,

1188 (D.C.Cir.1972)). *Accord Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951, 952 (D.C.Cir.1982) ("zone" standard requires some slight indicia that the statutory intent was to protect, benefit, or regulate the litigant's interest). To evaluate whether Congress had such an intent, our court and others generally have looked to relevant statutory provisions and their legislative history. *Control Data,* 655 F.2d at 294 (footnotes and citations omitted).[37] A court obviously has considerable leeway in applying this test, through both its identification of the perimeter of the "zone" of statutory interests and "the nature and quantity of the 'beneficial indicia' it requires" to fall within the "zone." *Id.* (footnote omitted). This court has stated that "slight beneficiary indicia" are sufficient to sustain standing. *Constructores Civiles de Centroamerica,* 459 F.2d at 1189.[38] Of course if

other cases, "[w]ithout mentioning the 'zone' test, the Court has rejected objections that certain plaintiffs lacked standing, although application of the test arguably would have yielded a different result." *Copper & Brass Fabricators Council,* 679 F.2d at 954 (citations omitted) (Ginsburg, J., concurring in the result). Professor Davis points out that the Court "failed to mention the ['zone'] test in 27 opinions on standing since 1970, even when the test was relevant." 4 K. Davis, *supra* n. 29, § 24.17, at 277.

**35.** Justices Brennan and White were particularly concerned that the examination of the statutory materials involved in a "zone" analysis would blur issues of standing, reviewability, and the merits, and thereby lead to poorly reasoned decisions. 397 U.S. at 170, 90 S.Ct. at 839.

**36.** The omitted footnote expands on the meaning of "the interest asserted by a party in the particular instance." *Control Data,* 655 F.2d at 293–94 & n. 19. That footnote quoted from our decision in *Tax Analysts:*

"We are aware of the confusion surrounding the meaning of which interests are relevant to the zone test .... Essentially, the confusion surrounds what exactly has to fall within the relevant zone: 1) the parties themselves; 2) the interests of the parties in general; or 3) the particular interest the parties are asserting in the litigation. It seems clear to us that the particular interests are the relevant interests ...."

*Control Data,* 655 F.2d at 294 n. 19 (quoting *Tax Analysts,* 566 F.2d at 142 n. 76).

**37.** To the degree *Tax Analysts* continues to suggest limits on the sources we may examine in our evaluation of congressional intent (*e.g.,* related statutory provisions and legislative history), *see* 566 F.2d at 140–43, we believe the sources are appropriate here for the reasons the court noted in *Control Data, see* 655 F.2d at 294 nn. 20 & 21.

**38.** *Constructores Civiles de Centroamerica* found that a Honduran corporation had standing to challenge its disqualification as a bidder on a contract awarded under a loan agreement between the Agency for International Development and the Central American Bank for Economic Integration, as authorized by the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 *et seq.* In explaining its finding of "slight beneficiary indicia," the court pointed out that the Foreign Assistance Act "speaks to socio-economic interests of the peoples of Latin America," and that "[c]ertainly the economy of a country is dependent upon the stability of local business enterprises such as [the disqualified bidder]." 459 F.2d at 1189.

*See also Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838 (D.C.Cir.1982) (disappointed bidder had standing to allege failure to abide by statutes and regulations governing contract awards because it was within "zone" of laws regulating awards, but did not have standing to allege maladministration of the contract because it was not within the "zone" of those rules, which are intended to protect

there is "*no* evidence of an intent to protect or benefit" plaintiffs, the "zone" test cannot be met. *Control Data,* 655 F.2d at 295 (emphasis in original).[39]

This guidance on how to apply the "zone" test is not altogether satisfactory. *See Copper & Brass Fabricators Council,* 679 F.2d at 953–55 (Ginsburg, J., concurring in the result). We have two particular concerns. First, a test that focuses on whether Congress *intended* to protect or benefit certain interests may be stricter than the Supreme Court's statement that the complainant's interest need only be "*arguably* within the zone of interests to be protected or regulated by the statute . . . in question." *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829 (emphasis added). Second, it may run counter to the Court's purpose for developing the "zone" test—to enlarge the class of people with standing—to deny standing to parties who have both suffered concrete injury caused by agency action and satisfied other prudential concerns, solely because a search for snippets of congressional language about their particular interest reveals nothing determinative. *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80–81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978) ("Where a party champions his own rights [as distinguished from the rights of a third party], and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met.") (citations omitted).

Given these concerns with our own court's "zone" test, it is especially important in applying the test to keep in mind the Court's statement in *Valley Forge College* —that the prudential principles of standing (including the "zone" test) are "close[ly] relat[ed] to the policies reflected in the Art. III requirement of actual or threatened injury amenable to judicial remedy." 454 U.S. at 475, 102 S.Ct. at 760.[40] The government does not contest in this case any Article III requirements or any prudential limitations other than the "zone" test. Therefore, in examining whether the requisite

---

the government, not bidders); *Howes Leather Co. v. Carmen,* 680 F.2d 818 (D.C.Cir.1982) (per curiam) (consumer of stockpiled goods arguably within "zone" of Strategic and Critical Materials Stock Piling Act, 50 U.S.C. §§ 98 to 98h–4); *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043 (D.C.Cir.1979) ("corporate shareholders concerned about environmental quality[] are within the broad zones of interest of both NEPA and the securities acts") (footnote omitted); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992 (D.C. Cir.1979) (per curiam) (parties complaining of noise, air pollution and congestion from vehicles using a parking lot owned by the federal government were within "zone" of NEPA but outside "zone" of Public Buildings Amendments of 1972, 40 U.S.C. § 490(j), (k)), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Diggs v. Shultz,* 470 F.2d 461 (D.C. Cir.1972) (persons denied entry and emigres denied reentry into Rhodesia (Zimbabwe), who alleged congressional decision to import from Rhodesia violated United States commitment to U.N. trade embargo, were within "zone" of U.N. Security Council Resolution on the embargo), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973).

**39.** *Control Data* found that suppliers of data processing equipment, who sought to challenge federal procurement rules for computers, were not within the "zone" of statutes that sought to maximize competition "for the benefits it could bring the government." 655 F.2d at 295–96 (citation omitted). *See also Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951, 953 (D.C.Cir.1982) (copper fabricators' interests are "incongruent" with, and therefore do not fall within the "zone" of, a law authorizing the reduction of the copper content of the penny, 31 U.S.C. § 317(b)); *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 143 (D.C.Cir.1977) (domestic oil producer's "competitive interest in fairness" was not within the "zone" of a tax credit provision, 26 U.S.C. § 901, under which the IRS, "to prevent . . . double taxation," permitted tax credits for payments made to foreign nations in connection with oil extraction and production), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

**40.** Even though there is a "close relationship" between the prudential principles and the Article III requirements, "the weighing of so-called 'prudential' considerations" of course "cannot substitute for" the constitutional "limit[s] on judicial power." *Valley Forge College,* 454 U.S. at 475, 102 S.Ct. at 760.

slight indicia of congressional concern with the plaintiffs' acknowledged injury are present, we believe it appropriate to define a wide perimeter for the "zone" and to recall the Supreme Court's formula that plaintiffs' interests need only be "arguably" within that zone.[41]

### 2. The Effect of Kissinger on Plaintiffs' Standing

█ We turn first to the government's assertion that *Kissinger* should settle the "zone" issue here without further analysis. Like the district court, we cannot accept this short cut through the "zone." First, *Kissinger* analyzed the records management statutes to determine whether the plaintiffs could assert a private right of action under those laws. Certainly the relatively rigorous requirements for establishing congressional intent to create a private right of action[42] should not be equated with the "slight" indicia standard under the "zone" test. Since *Kissinger* made its findings about congressional intent in a different context and with a different standard, it would be inappropriate to have them control here absent additional supporting analysis.

Second, *Kissinger* stated that it was *not* deciding the question of whether Congress intended private parties to have any remedies under the APA for agency actions in breach of a duty to enforce the records laws. 445 U.S. at 150 n. 5, 100 S.Ct. at 968 n. 5. Like the district court, we cannot reconcile how the Court could leave open the question of an APA remedy for private parties while it also supposedly decided that the records laws would not permit any private plaintiffs the standing to seek the remedy. *See American Friends Service Committee v. Webster,* 494 F.Supp. at 805–06.

Third, the *particular interests* of the plaintiffs in *Kissinger* were different from those of the plaintiffs here. In *Kissinger,* the plaintiffs wanted the Library of Congress to return allegedly wrongfully removed records to the State Department so that the records could be processed under FOIA requests. In this case, the plaintiffs, who have sought or plan to seek access to FBI records, want to halt alleged wrongful record *destruction* (no chance of later retrieval or access through another government institution) *by the government itself.* As we explained above, the "zone" test is supposed to focus on "the interest asserted by a party in the particular instance." *Control Data,* 655 F.2d at 293–94 (footnote omitted). Since *Kissinger* involved interests substantially different from those of the plaintiffs here, we are understandably wary of extending to the plaintiffs' interests here, without further analysis, *Kissinger* 's statements about Congress' intentions regarding the *Kissinger* plaintiffs' interests.

Finally, we decline to accept the government's suggestion that one sentence characterizing Senate Report language quoted in *Kissinger* necessitates our reversal of the district court. The sentence and quotation are as follows:

> direction from the Court, we follow past guidance and conclude that if plaintiffs here satisfy the "zone" test (along with the constitutional standards and the prudential factors not in question here), they also will meet the demands of § 702. *See Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829.

**41.** We recognize that the debate over the particular tests for classic standing carries over to interpretations of the APA's standing requirement, 5 U.S.C. § 702. *Compare* 4 K. Davis, *supra* n. 29, § 24.3 (arguing for an "injury in fact" test for standing to challenge agency action and arguing against an interpretation that persons must be "adversely affected ... within the meaning of a relevant statute") *with* S. Breyer & R. Stewart, *Administrative Law and Regulatory Policy* 931 & n. 147 (1979) (arguing that § 702 provides standing to persons suffering injury to interests protected either by common law or statute and to persons "adversely affected or aggrieved" under the terms of a specific agency statute, while criticizing Davis' "injury in fact" interpretation). Absent further

**42.** *See Kissinger,* 445 U.S. at 148 & n. 4, 100 S.Ct. at 967 & n. 4 (citing *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

The legislative history of the [Records] Acts reveals that their purpose was not to benefit private parties, but solely to benefit the agencies themselves and the Federal Government as a whole. The Senate Report to the Federal Records Act of 1950 reveals this focus. S.Rep. No. 2140, 81st Cong., 2d Sess., 4 (1950). The Report states:

> "It is well to emphasize that records come into existence, or should do so, not in order to fill filing cabinets or occupy floor space, or even to satisfy the archival needs of this and future generations, but *first* of all to serve the administrative and executive purposes of the organization that creates them. There is danger of this simple, self-evident fact being lost for lack of emphasis. The measure of effective records management should be its usefulness to the executives who are responsible for accomplishing the substantive purposes of the organization.... [The] *first interest* is in the establishment of a useful system of documentation that will enable [the executive] to have the information he needs available when he needs it."

*Kissinger,* 445 U.S. at 149, 100 S.Ct. at 968 (emphasis added).

To begin with, we must question whether the passage from the Senate Report supports the Court's statement that the purpose of the records acts "was ... solely to benefit the agencies ... and the Federal Government." The Senate Report states that the records are *created "first of all"* to serve the organization and that the *"first interest"* of an executive is an information system that gives him what he needs when

he needs it. This language suggests the existence of a number of interests. Indeed, the same paragraph of the Senate Report states that "[t]he establishment of an orderly system of [records] disposal is not the *major interest* of an executive in records." S.Rep. No. 2140, 81st Cong., 2d Sess. 4 (1950), U.S.Code Cong.Serv. 1950, pp. 3547, 3550 (emphasis added). And the paragraph concludes that "[t]here is no essential conflict in these *two interests* [orderly records disposal and an information system that maintains necessary materials], but they should be kept in proper perspective." *Id.* (emphasis added).

Thus, the 1950 Senate Report reveals that the records laws are concerned at a minimum with two interests—providing public executives with useful information and disposing of records in an orderly manner. But the quoted passage from the "General Statement" section of the 1950 Senate Report is not a good source of evaluating whether *plaintiffs' interests* might be within the "zone" of the records laws concerning *disposal, see* 44 U.S.C. §§ 3302, 3303, 3303a, because the disposal laws were not even a part of the Federal Records Act of 1950.[43] To identify whether there are slight indicia that plaintiffs' interests are within the "zone" of the disposal laws, we look next to statutory sources that deal directly with records disposal and preservation.

### 3. The "Zone" Reflected in the Statutory Language

The key features of the records disposal system are set out in 44 U.S.C. §§ 3302, 3303, 3303a. We have already referred to the statutory standard for records maintenance: "sufficient administrative, le-

---

**43.** A major feature of the Federal Records Act of 1950 was the establishment of agency heads' responsibility for their agencies' recordkeeping practices. The legislation included a description of an agency head's general record management duties:

> The head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the informa-

tion necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities. Pub.L. No. 81–754, § 506(a), 64 Stat. 583, 586 (codified at 44 U.S.C. § 3101). As we explain in the text, we find this language significant for our "zone" analysis. To the degree the passage in the "General Statement" section of the Senate Report conflicts with the import of § 3101 for plaintiffs' interests, we of course look first to the statutory language.

gal, research, or other value to warrant their further preservation by the Government." *Id.* §§ 3303, 3303a. (Subsection 3303a(a) substitutes the word "continued" for "further," which appears in both § 3303 and § 3303a(d).) Standing alone, that phrase suggests that Congress intended the records to be available for specific purposes, but does not imply for whom. One subsection suggests, however, that Congress had something other than a corporative state notion in mind, wherein the government's records would only be available for the government's administrative, legal, and research interests. Subsection 3303a(c) permits the Administrator of GSA to seek advice from Congress on the disposal of any "particular records" that he considers may be of "special interest to the Congress" or when he considers consultation to be "in the public interest." Both these considerations undercut the notion that records are kept only for executive branch management purposes.

Congress may well have considered that it might need to be consulted about records disposition when the disposal decision evoked significant public concern or outrage. As the body representing the public's various interests, Congress could best advise NARS about how a disposal decision should take account of "the public interest," a criterion for consultation identified by § 3303a(c) itself. In practice, we expect that Congress' counsel to NARS depends in large part on public reactions to and fears about records destruction.[44] Therefore, there appears to be an intent underlying this specific consultative mechanism to recognize and protect the public's interests in government records (not just the agency's interest).

This evidence that Congress expected private parties to have an interest in records preservation is bolstered considerably by *id.*

§ 3101, which sets out the general records management duties of agency heads. That section requires agency heads to "preserve records . . . to furnish the information necessary to protect the legal and financial rights of the Government *and* of persons directly affected by the agency's activities." *Id.* (emphasis added). The final phrase is right on target for one of the three categories of plaintiffs bringing this action; those plaintiffs do not just hit the zone, they score a bull's-eye. The government contends that we should ignore § 3101 because it imposes a duty on the FBI, not NARS, does not limit NARS' authority to approve of disposals under § 3303a, and leaves the FBI the discretion to determine what is "adequate" documentation. This argument overlooks two points: (1) this case involves both the FBI's and NARS' performance of records preservation and disposal duties, and (2) in a "zone" standing analysis we do not evaluate the correctness of the FBI's or NARS' actions, but only determine if there is even slight evidence of congressional intent to protect, benefit, or regulate plaintiffs' interests. There is no doubt that § 3101 is evidence of Congress' intent to protect some of the plaintiffs' interests here.

The laws pertaining to the National Archives also provide evidence of Congress' intent to benefit these plaintiffs through preservation of records of "research" value under §§ 3303, 3303a. The government charily admits, as discussed above, that 44 U.S.C. §§ 2106, 2901(9) provide "[t]he only recognition of a possible general public interest in federal records." Government's Opening Brief at 37. We find other sections that also support the public's interest in Archives materials. *See, e.g.,* 44 U.S.C. § 2103(3) (authorizing transfer of Archives records "to public or educational institutions or associations"), § 2105 (requiring exhibition of records as appropriate, including

---

44. Indeed, when Congress has expressed a strong interest in FBI records destruction in recent years, the matters at issue were ones of major concern to the public and various particular private groups. *See* 121 Cong.Rec. 1431–34 (1975) (passage of S.Res. 21, 94th Cong., 1st Sess. (1975), establishing the Senate Select Committee to Study Government Operations

With Respect to Intelligence Activities; also reporting that a letter would be sent to 19 governmental units requesting the retention of records related to the investigation). *See also American Friends Service Committee v. Webster,* 485 F.Supp. at 229 n. 13 (noting a request by the Senate Select Committee on Assassinations that the FBI retain certain records).

guides to facilitate use and publication of historical works), § 2110 (authorizing preservation, exhibition, and release "for nonprofit educational purposes" of films, still pictures, and sound recordings).

The government would ignore this evidence of Congress' intent to protect and benefit plaintiffs' interests and seal it off from the "zone" of the records management and disposal laws. The government argues that this case does not involve Archives records. This contention severs the "zone" from the "zone of interests" test. It also ignores the simple, practical fact that government records can only be accepted by the Archives, where they may be made available to the public, if the agency that creates them has not destroyed them first. As explained in Part II, the records management and disposal laws constitute an integrated system for handling records. Under this system agencies generally manage their own records programs, while operating under NARS principles and guidance. When it comes time for an agency to dispose of records, the agency proposes records schedules for disposal to NARS, which must decide whether the schedules meet the § 3303a standard. The term "disposal" itself is defined to include transferring records of "sufficient historical or other value to warrant continued preservation" to the National Archives. 44 U.S.C. § 2901(5)(C). Finally, NARS may accept and select certain agency records for deposit in the Archives. In evaluating whether Congress intended to protect or benefit particular interests through the records disposal process, we cannot ignore what Congress said about the interests it intended to benefit through its records preservation requirements.

### 4. The "Zone" Reflected in the Legislative History

We have found in the pertinent records statutes considerably more than slight indi-

cia that Congress intended to benefit and protect some of the plaintiffs' particular interests in this case. Therefore, we make only a few supplementary supportive points about the legislative history of these laws. First, the government argues that when Congress created the records disposal standard of 44 U.S.C. §§ 3303, 3303a in 1943, it only restated more clearly the prior standard, which referred to records of "permanent value or historical interest to the Federal Government." See Records Disposal Act of 1939, Pub.L. No. 76–295, §§ 3–5, 53 Stat. 1219, 1220. The present standard refers to "sufficient administrative, legal, research, or other value to warrant . . . preservation by the Government." 44 U.S.C. §§ 3303, 3303a. The legislative history's only explanation of the substitution is that the old standard was "ambiguous." H.R. Rep. No. 559, 78th Cong., 1st Sess. 2 (1943). The government wants us to believe that Congress, in the course of specifying its preservation criteria more carefully, did not realize that it was deleting the reference to the government's interest as an exclusive one. This is unlikely. It is more probable that Congress wanted to clarify the reasons for preserving records and this refinement included removing any impression that only the government would have an interest in the records. This is how NARS appears to have interpreted its mandate to set standards for preservation according to its Handbook on the disposition of federal records.[45]

Second, we note that the legislative history of the Federal Records Act of 1950, Pub.L. No. 81–754, 64 Stat. 583, also suggests a congressional intent to benefit and protect plaintiffs' interests—thereby adding yet another reason why we cannot rely solely on the 1950 Senate Report passage, cited first in Kissinger and then by the govern-

---

**45.** See n. 19, supra. The NARS Handbook's chapter on records values and the appraisal process, see J.S.A. at 611–17, includes a number of references to the interests that certain private parties and the public have in agency records. For example, in discussing the preservation of records of "evidential value," the

Handbook explains: "For students of public administration, historians, and other social scientists, the records are sources for evidence of how the Government conceived of the needs of its citizens and how it served them." J.S.A. at 614.

ment, to resolve the "zone" issue. Subsection 506(a) (codified at 44 U.S.C. § 3101) of the 1950 legislation stated:

> The head of each Federal agency shall cause to be made and preserved records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the *information necessary to protect the legal and financial rights* of the Government and *of persons directly affected by the agency's activities.*

64 Stat. 586 (emphasis added). Both the Senate and House Reports stated that § 506(a) "provides a general declaration by the Congress [to maintain adequate records]." S.Rep. No. 2140, 81st Cong., 2d Sess. 15 (1950), U.S.Code Cong.Serv. p. 3562 [hereinafter "1950 S.Rep."]; H.R.Rep. No. 2747, 81st Cong., 2d Sess. 14 (1950) [hereinafter "1950 H.R.Rep."]. The reports also explained that the provision was necessary because "[s]pecific laws direct the heads of certain agencies to ... maintain certain records, but there is no general requirement." 1950 S.Rep. at 15, U.S.Code Cong. Serv. 1950, p. 3562; 1950 H.R.Rep. at 14. The government seizes on the phrases "general declaration" and "general requirement" to imply that Congress did not intend § 506(a) to impose any particular duty. This contention cannot overcome the specific language at the end of the subsection, which imposes a responsibility to preserve records to furnish information to protect the rights of persons directly affected by agency activities. That language imposes a "general" duty in the sense that Congress imposed it without adding exact instructions on implementation and in the sense that the requirement is applied across-the-board to all agencies. Specific laws direct particular agency heads to preserve certain records, as the report language explained, but Congress apparently believed that the need to protect records concerning allegedly injured private parties was a general one extending to all agencies.

Section 507 of the 1950 legislation (codified as amended at 44 U.S.C. §§ 2101, 2103–2110), also reflects Congress' recognition that private parties such as some of these plaintiffs have an interest in agency records. Section 507 dealt in part with transferring records from agencies to the National Archives. It included "a general repeal clause [for records in existence for 50 years] to statutory and other restrictions governing the *use of records by scholars and the public generally.*" 1950 S.Rep. at 16, U.S.Code Cong.Serv. 1950, p. 3563; 1950 H.R.Rep. at 15. (Emphasis added.) If Congress did not expect the public to have access to and an interest in these records, there would be no reason for the restrictions on the use of some records and no purpose served by the general rule that restrictions should be removed after 50 years.

This 50 year limit was reduced to 30 years in 1978, *see* Act of Oct. 5, 1978, Pub.L. No. 95–416, 92 Stat. 915 (amending 44 U.S.C. §§ 2103, 2104). At that time Congress reiterated the interest that researchers and the general public have in agency records. *See* H.R.Rep. No. 1522, 95th Cong., 2d Sess. 2, 3 (1978), U.S.Code Cong. & Admin.News 1978, p. 2288. In particular, the House Report explained that the change from 50 to 30 years was designed to make access by the public *easier*:

> The Archivist has no authority [under the pre-1978 law] to remove restrictions placed by agencies until the documents are 50 years old. As a result, requests for restricted documents must be made under the Freedom of Information Act, an inefficient way to deal with large numbers of historical documents.
>
> More careful scrutiny when restrictions are proposed should *simplify access problems for the researcher,* the agency, and the Archives.

*Id.* at 2, U.S.Code Cong. & Admin.News 1978, p. 2289 (emphasis added). A letter from the Acting Administrator of GSA, expressing GSA's views on the bill to the House committee, also recognized the public's interest. This bill, he wrote, "would assure a more equitable balance between protecting those records which legitimately require protection for a period of time and

providing greater public access to records of historical significance and interest." *Id.* at 4, U.S.Code Cong. & Admin.News 1978, p. 2291 (appending letter of July 10, 1978, from Robert Griffin, Acting GSA Administrator, to the Hon. Jack Brooks, Chairman of the House Committee on Government Operations).

### 5. *Conclusion*

██ In sum, the legislative history of the records acts supports a finding that Congress intended, expected, and positively desired private researchers and private parties whose rights may have been affected by government actions to have access to the documentary history of the federal government. Of course, that access is subject to various restrictions, including possibly an appropriate delay of time. At this date, however, even a 30-year wait would permit access to records on World War II, the Korean War, the Rosenbergs' investigation and trial, and the McCarthy era.

██ Various private parties and the public cannot review records that an agency has destroyed in violation of the disposal laws. This appears to us to be a sufficient interest, given Congress' expressions about these parties' and the public's expected access to records, to be "arguably" within the "zone" of the disposal statutes. The disposal laws refer to administrative, legal, and research concerns. It is clear that Congress did not expect that only the government would have those concerns and that only the government would benefit from proper disposal practices. In addition, some of the plaintiffs' interests are even more directly covered by the language of the laws dealing with preservation duties. *See* 44 U.S.C.

§ 3101. Therefore, we conclude that the plaintiffs meet the "zone of interests" test for standing.

## V. COMPLIANCE WITH THE DISPOSAL LAWS

### A. *District Court Findings*

The district court held that:

[t]he evidence ... shows that the Archivist and those under his supervision have failed for a period of over thirty years adequately to carry out [their] statutory and regulatory responsibilities with respect to the records of the Federal Bureau of Investigation..

*American Friends Service Committee v. Webster,* 485 F.Supp. at 228.

In its review of the facts, the court stressed that the Archivist rarely exercised any review over FBI records disposal practices during that thirty-year period. *Id.* at 229. In 1946, the Archives approved an FBI request to destroy all closed field office files, operating under what the court found to be "the [incorrect] theory ... that these files were mere duplicates of the records ... maintained at FBI headquarters." *Id.* In 1969, NARS "promulgated a new plan purporting to establish document retention standards and providing that FBI records officers would identify the specific series of files to be retained." *Id.* (footnote omitted). In 1975 and again in 1976, the FBI made requests, the longest of which was about 150 words (half a page), to dispose of certain field office files, and the Archives granted both promptly. In 1977, NARS approved a slightly more extensive FBI records disposal schedule covering primarily headquarters files. *See id.* at 229–31.[46]

---

**46.** The FBI did not implement the 1975 and 1976 authorizations at the time because it had imposed a moratorium on records destruction pursuant to a request from the Senate. The Senate made this request when it created the Select Committee to Study Governmental Operations With Respect to Intelligence Activities. *See* S.Res. 21, 94th Cong., 1st Sess. (1975), 121 Cong.Rec. 1431–34 (1975). The moratorium remained in effect until Aug. 15, 1977, when the Archivist approved the recommencement of records destruction. *See American Friends*

*Service Committee v. Webster,* 485 F.Supp. at 229 n. 13.

There have been other moratoria on the destruction of particular files dealing with national security investigations, litigation, intelligence activities, and assassinations—some at the request of congressional committees. All these moratoria were voluntary on the part of the Department of Justice and the FBI and, absent a court order, could have been ended by them at any time. *See id.* at 229 n. 13, 234 n. 32. In response to a question at oral argument, government counsel stated that he believed all

The district court found it especially troubling that "[d]uring that entire period, neither in connection with the approval of the various plans and schedules nor during the interim years did a single employee of the Archives see a single FBI file." *Id.* at 229 (footnote omitted). Not until 1978, "as a result of media and congressional interest ..., [did] two or three Archives employees ... inspect ... some seventy-six files" at FBI headquarters and several field offices. *Id.* at 230. "But even that inspection was limited to records which FBI personnel had preselected (after the Archives employees had designated the general areas in which they wished to conduct audits)." *Id.*[47]

The court noted that as a result of this extreme deference to the FBI, all NARS decisions were made on the basis of the FBI's representations—which "were in some respects incorrect, and in all respects unverified." *Id.* at 229. In particular, NARS never ensured "that the FBI, on its own, was preserving not only records suited to its own bureaucratic and operational needs but also records useful for historical and other research and for the safeguarding of legal rights." *Id.* at 230.

On the basis of these facts, the district court made its legal conclusion:

It is thus clear that the Archivist never discharged his statutory responsibility to make independent judgments concerning the record retention and destruction practices of the Federal Bureau of Investiga-

tion.... [T]he Bureau's records disposal program, never having been considered and passed upon in any meaningful way by the Archives, cannot continue to be implemented consistently with the statutory mandate that records may be destroyed only pursuant to standards and procedures promulgated and approved by the archival authorities.

*Id.*

The district court stressed three aspects of NARS' "archival neglect." *Id.*[48] First, NARS failed to inspect records. Second, NARS "failed to conduct critical examinations of the [1975, 1976, and 1977] schedules submitted [by the FBI] ... to ascertain whether, by the FBI's own descriptions, records were being retained in accordance with the standards imposed by law." *Id.* Third, NARS did not "require the FBI to submit the very minimal forms required under the regulations." *Id.*

Finally, the court noted two of the harms caused by the government's failure to implement the records laws properly. First, it observed that the destruction of field office files meant that "[r]aw investigative data[,] ... ordinarily maintained solely in the field offices," would be lost for all time. *Id.* at 232. The court remarked that these data are both "the stuff of primary research" for scholars inquiring how and why FBI investigations are conducted, and the core evidence for people claiming that FBI investi-

---

the moratoria had expired, although of course there could be no records destruction currently (with certain exceptions) because of the district court's order enjoining it.

After approving the 1977 schedule, the Archivist submitted it to Congress for advice pursuant to 44 U.S.C. § 3303a(c). Congress has not yet, to our knowledge, acted on this submission. NARS and the FBI were free, prior to the district court's injunction, to implement the 1977 schedule but did not. *See* 485 F.Supp. at 230 n. 21.

**47.** The 1978 inspection was part of a NARS evaluation of FBI field office disposal practices. This survey resulted in a December 1978 report that stated that the FBI's authority to dispose of field office files need only be changed in two respects: (1) the retention periods should be defined more clearly; and (2) records should be

retained until they were both no longer necessary for administrative needs *and* a minimum fixed retention period had passed. The 1975 and 1976 schedules had required disposal whenever either administrative needs had been met *or* a fixed time period had passed. The FBI amended the two disposal schedules accordingly. *See* Defendants' Exhibits 20, 21, 26, 28, 29, 30, 31, 32; Plaintiffs' Exhibits 21, 34.

**48.** The district court found this neglect especially disturbing because:

the FBI's relationship to this country's history and the legal rights of its citizens is unique, and the intensity of the scrutiny to which its files should be subjected before they are authorized to be destroyed must reflect that uniqueness.

*American Friends Service Committee v. Webster,* 485 F.Supp. at 234.

gative practices violated their legal rights. Moreover, the court stated that the government's witnesses conceded that their standard for forwarding material to FBI headquarters was *solely* whether the records would assist the headquarters staff in law enforcement and in making agency decisions. *Id.* "No effort was made at any time to forward to headquarters data which might be regarded as useful or significant in other respects; *e.g.*, records having historical or research value, [or] documents bearing on the legal rights of individuals...." *Id.*

The second harm was that NARS "acquiesced in ... FBI measures to escape the burdens of the Freedom of Information Act by disposing of some of its files." *Id.* Even though "[i]t appears likely that the agencies' concerns were ... limited to minimizing the administrative difficulties," the court believed "it is clear that the FOIA influenced the drafting of the 1977 schedule and reflected an [impermissible] bias ... in favor of the destruction ... of governmental records." *Id.* at 233.

## B. *The Government's Contentions*

The government offers three challenges to the district court's conclusions. First, the government contends that the FBI's records disposal system has been, and continues to be, in compliance with the law. It traces the FBI's authority to dispose of closed field office files to the 1946 approval of a disposal schedule by Congress' Joint Committee on the Disposition of Executive Papers. *See* Government's Opening Brief at 48 (citing 44 U.S.C. § 3306, *repealed by* Act of June 23, 1970, Pub.L. No. 91–287, § 2, 84 Stat. 320, 321–22); Plaintiffs' Exhibit 17 (the 1946 FBI disposal schedule, including notation of congressional approval of disposal job no. 346–S237). The government maintains that this disposal authority was not affected by Congress' decision in 1970 to delegate to NARS the power to approve of disposal schedules. Government's Opening Brief at 49–50. The 1975 and 1976 disposal schedules for field office

files, approved by NARS, "simply reaffirmed the determination ... made in 1946." *Id.* at 50–51. Furthermore, the government states that the district court was "clearly erroneous" in finding that NARS, in evaluating disposal schedules for field office files, assumed that field office and headquarters records were practically identical. *Id.* at 51–52. The government concludes that the court wrongly imposed its own assessment that "raw investigative data" in field office files were the valuable "stuff of primary research"—and the government adds that Congress has not required the FBI to preserve primary research material in any case. *Id.* at 52–53.

Second, the government maintains that it does not have any duty to inspect agency records before it approves of their disposal. In evaluating agency proposals for records disposal, NARS need only "examine the lists and schedules submitted." 44 U.S.C. § 3303a(a). The government points out that NARS may decide to inspect records under *id.* § 2906, but that the § 2906 authority is permissive, not required. *See* Government's Opening Brief at 53–57.

Third, the government attacks the district court's conclusion that NARS "abdicated" its statutory responsibilities to the FBI. The government believes the court was confused about the allocation of duties under the records laws: It argues that it is NARS' responsibility to set "general standards indicating what kind of records the FBI should preserve," and the FBI's duty to apply those standards. *Id.* at 57–58. Moreover, the government suggests that the court's focus on the 1977 schedule is misplaced because that schedule has never been implemented.[49] In addition, the government explains that NARS could "rely on the FBI to apply the standards set in the 1946, 1975, and 1976 records disposal schedules" because Congress approved those basic standards in the 1946 schedule. *Id.* at 58. And the Records Retention Plan (an approach NARS has abandoned) developed from 1968 to 1970 also supposedly did not

**49.** *See* n. 46, *supra.*

involve improper delegation by NARS because under the regulations in effect it was the FBI's job to identify the specific series or records segments for preservation within the general categories established by NARS. *Id.* at 59–60 (citing 41 C.F.R. § 101–11.403.3(c) (1979)). Finally, the government maintains that NARS correctly aided the FBI in minimizing administrative difficulties associated with FOIA requests and that in doing so NARS actually protected FOIA concerns. Government's Opening Brief at 61–62.

### C. Analysis of Alleged Disposal Violations

#### 1. Scope of Review

■ Under the APA, we "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In this case, this test requires two basic inquiries. The first is whether NARS properly interpreted its statutory responsibilities—whether its actions were "in accordance with law." *Id.* In making this inquiry we give the agency interpretation some deference, but by no means forego our traditional role of deciding "all relevant questions of law." *Id.* § 706. *See Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 39, 102 S.Ct. 38, 42, 46, 70 L.Ed.2d 23 (1981); *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1422–23 (D.C.Cir.1983).

The second question is whether the agency actions taken under the statutory authority are "arbitrary and capricious." The Supreme Court recently summarized the requirements of this standard in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "The scope of review ... is narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 2866. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 2866–67 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). "In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 2867 (quoting both *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) and *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Of course, we recognize that there is a major analytical difference between reciting this guidance and applying it to the facts of specific agency action. As this court commented in *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031 (D.C.Cir.1979) (footnote omitted):

> [T]he concept of "arbitrary and capricious" review defies generalized application and demands, instead, close attention to the nature of the particular problem faced by the agency. The stringency of our review, in a given case, depends upon analysis of a number of factors, including the intent of Congress, as expressed in the relevant statutes ...; the needs, expertise, and impartiality of the agency as regards the issue presented; and the ability of the court effectively to evaluate the questions posed.

*Id.* 103 S.Ct. at 1050, *quoted in Office of Communication of the United Church of Christ,* 707 F.2d at 1425 n. 22.

#### 2. Statutory Responsibilities

■ The district court found that NARS failed to carry out a number of statutory and regulatory responsibilities with respect to the disposal of FBI records. First among these omissions was the failure to inspect FBI records. While we agree that NARS' ability to make independent judgments about records retention and destruction practices would be enhanced by such inspections, we conclude that inspections are not required by law.

The pertinent language of 44 U.S.C. § 2906(a)(1) states:

> In carrying out his duties and responsibilities under *this chapter* [44 U.S.C. §§ 2901 to 2909], the Administrator ... or his designee *may* inspect the records or the records management practices and programs of any Federal agency solely for the purpose of rendering recommendations for the improvement of records management practices and programs.

(Emphasis added.) The use of the word "may" grants permissive authority without requiring any action. Furthermore, the reference to chapter 29, which deals primarily with NARS' functions of setting standards for and offering advice to agencies, suggests that this inspection authority is not directly linked to the records disposal provisions in chapter 33. While we certainly do not imply that NARS' inspections and follow-up recommendations on "records management practices and programs" under § 2906 cannot address records disposal and preservation issues, *see id.* §§ 2902(5), 2905(a), such inspections are not compulsory.

■ We also cannot find a duty for NARS to inspect records in the statutes dealing specifically with records disposal. Section 3302 requires NARS to promulgate regulations establishing both procedures for compiling and submitting lists and schedules of records for disposal, and procedures for disposing of records. After agencies propose lists or schedules of records for disposal, *see id.* § 3303, NARS is to examine them (not necessarily the records themselves) under § 3303a. Section 3303a then requires NARS to "determine [ ] that ... the records listed in a list or schedule" meet the disposal standards, a mandate that invites record sampling but again does not require it.

The district court's one specific citation supporting its finding of a duty to inspect, 41 C.F.R. § 101–11.403–4(e) (1979), also cannot bear the weight of an inspection requirement. That regulation stated that NARS "will conduct periodic inspections to assure that the [regulatory] provisions [dealing with the maintenance of specific records or file segments specified for retention] ... are being carried out." The inspections under § 101–11.403–4(e) appear to have been linked to the disposal process. *See id.* § 101–11.403–2(c) (1979).[50] It is not clear, however, whether those inspections would have necessarily involved screening particular records. It is arguable that a records check would have been necessary to ensure that an agency had been segregating the specific records or files segments it had marked for retention. But we need not pursue this argument because there is a more important limit on our ability to act on the basis of § 101–11.403–4(e) in this case: Subsection 101–11.403–4(e) and the particular preservation program of which it was a part have been superseded in the regulations; the present regulations focus agency efforts on the development of comprehensive schedules for records disposal rather than an identification of a core set of records for preservation. *See* Government's Opening Brief at 12 n. 10, 59; *compare* 41 C.F.R. § 101–11.404–1 (1982) *with id.* § 101–11.403 (1979). Given plaintiffs' request for prospective relief with respect to FBI records, even if we found that NARS had failed to perform required inspections under the old system, that shortfall would have no current significance so long as the FBI's present disposal program complies with present regulations.[51]

---

**50.** We note, however, that 41 C.F.R. § 101–11.403–4(e) (1979) cited *id.* § 101–11.103, which stated that NARS would periodically inspect agency records programs to evaluate their effectiveness and compliance with the laws and regulations. Thus, *id.* § 101–11.103 (1979)—which remains in effect in the same form today, *see id.* § 101–11.103 (1982)—seemed to envision inspection as a check on agency records program performance, not as a required step in the disposal process. Since we discuss in the text other reasons why we cannot rely on *id.* § 101–11.403–4(e) (1979) to justify an inspection remedy in this case, we need not address further what impact the citation of § 101–11.103 had on the link between inspection and disposal.

**51.** The same reasoning applies to another of the district court's grounds for finding that NARS failed to carry out its legal duties: that NARS did not "require the FBI to submit the

The district court also found that NARS misinterpreted its duty under § 3303a to conduct critical examinations of the 1975, 1976, and 1977 FBI disposal schedules before approving them. On its face, § 3303a requires an examination and determination by the GSA Administrator (or NARS) that the records disposal lists and schedules proposed by an agency meet the disposal standards. *See also* 41 C.F.R. § 101–11.404–1 (1982) (outlining NARS' role in the preparation and approval of comprehensive agency records disposition schedules); *id.* § 101–11.405 (explaining that NARS sets standards for and determines whether records are of permanent value); *id.* § 101–11.406 (describing the process through which NARS approves requests to dispose of records). The government presents three arguments to the effect that NARS need not have undertaken a critical examination of these three schedules. We find them unpersuasive.

█ First, the government suggests that NARS' duty extends only to setting standards for records retention and providing advice to agencies on how to operate their records programs. True, NARS is required to perform these functions. *See, e.g.,* 44 U.S.C. §§ 2904, 2905. But neither these tasks nor its limited number of personnel relieve NARS of its statutorily assigned duties in the records disposal process. *See id.* §§ 3302, 3303a. In 1970, Congress clearly intended to transfer final approval authority over the disposal of records to NARS; in doing so it repealed the laws that required referral of all disposal lists and schedules to a joint congressional committee for review and recommendation. *See* Act of June 23, 1970, Pub.L. No. 91–287, § 2, 84 Stat. 320, 321–22 (1971). NARS now has sole approval responsibility.

█ Second, the government contends that the 1975 and 1976 schedules for field office files merely "reaffirmed" the 1946 schedule approved by Congress; therefore, they need no scrutiny. This reasoning would have us rely on a one paragraph description of field office records in the 1946 schedule [52]—which contains almost no explanation of why these records do not warrant preservation and which Congress approved almost forty years ago—to immunize all FBI field office files from the provisions of §§ 3302, 3303a (and regulations thereunder) until the FBI decides to propose a "non-affirming" schedule. If we accorded such a long reach to the 1946 approval, we would allow the FBI to circumvent Congress' subsequent statutory instructions on records preservation duties and retention standards, *see, e.g.,* 44 U.S.C. §§ 2905, 3101, as well as the statutory process for approving disposals that Congress recrafted in 1970, *see id.* § 3303a.

Congress did not intend to grant the FBI such a blank check for records disposal. Section 3314 states that "[t]he procedures prescribed by [chapter 33] are exclusive, and records of the United States Govern-

---

very minimal forms required under the regulations." *American Friends Service Committee v. Webster,* 485 F.Supp. at 230. In discussing this point, the court referred to the FBI's inadequate completion of Part II of a 1970 records plan. *See id.*

Under prior regulations, NARS was to work with agencies to develop "a records retention plan designating the permanently valuable classes of records." 41 C.F.R. § 101–11.403–3(b) (1979). Then the agency was supposed to identify "the specific records or segments of files allocated to the classes specified for retention by the plan," and to revise records control schedules to ensure that those records would be retained. *Id.* § 101–11.403–3(c), .403–4(b) (1979). The district court criticizes both the FBI's final product and its delay in forwarding its portion of the plan to NARS (although the

court notes that NARS personnel said they had access to the plan at the FBI's facilities). 485 F.Supp. at 230 & n. 19.

We note that under that prior regulatory scheme, NARS' inspection of the FBI's portion of the plan, whether or not the FBI sent it to NARS, may have been sufficient so long as the FBI submitted lists and schedules of records for disposal to NARS for approval under 44 U.S.C. § 3303a (or, prior to the enactment of § 3303a in 1970, to Congress). *See* 41 C.F.R. § 101–11.403, .404 (1979). We need not delve deeply into the FBI's compliance circa 1970, however, because the prospective relief sought here requires us to evaluate the legality of the FBI's present disposal practices.

**52.** *See* Plaintiffs' Exhibit 17.

ment may not be alienated or destroyed except under [chapter 33]." Section 3105 requires agency heads to establish safeguards to prevent records destruction except in accord with §§ 3301 to 3314. Of course chapter 33 includes § 3303a, which requires the Administrator of GSA (or NARS) to examine and approve all proposed schedules for records disposal. The government comes close to admitting that it must comply with § 3303a in its explanation of why it offered the 1975 and 1976 schedules in the first place—"the FBI was concerned that it comply with the spirit of the records disposal laws as well as their letter." Government's Opening Brief at 50. In evaluating whether NARS needed to evaluate and approve the 1975 and 1976 schedules, we abide by the letter of § 3303a, which states that NARS had that duty.

■ The government's argument is further undercut by its own regulations. The present regulations define "temporary records" as records that the *Archivist* has determined to be of insufficient value to warrant preservation. 41 C.F.R. § 101–11.406–2 (1982). By designating records as "temporary," NARS earmarks them for future destruction or donation. *See id.* § 101–11.402, .406–2. According to § 101–11.406–2, NARS' determination may take one of three forms: a one-time authorization of records identified on a disposal list; a designation as disposal under a General Records Schedule issued by NARS for records common to many agencies (*e.g.,* payroll and personnel records); or "[a] series of recurring records designated as disposable in an agency records disposition schedule approved by NARS (§ 101–11.404–1)." The only category the 1946 schedule could even remotely fit is the third. But an examina-

tion of § 101–11.404–1 reveals that it falls woefully short of the requirements of "[c]omprehensive agency records disposition schedules." These schedules are to cover all agency records, to include certain specific statements and descriptions, to be reviewed annually, to be updated as necessary, and to be approved by NARS. In sum, the 1946 schedule does not meet the regulatory requirements authorizing ongoing disposal, so the 1975 and 1976 schedules cannot "reaffirm[ ]" the 1946 schedule unless they meet the statutory and regulatory requirements on their own.[53]

■ Finally, the government proposes that we need not review NARS' approval of the 1977 schedule because it has never been put into effect.[54] Because Congress and the public expressed fears about FBI records destruction, NARS decided to seek congressional advice under § 3303a(c) after approving but before implementing the 1977 schedule. To the best of our knowledge, Congress never responded to NARS' request, either positively or negatively. Therefore, NARS and the FBI decided not to take any action under the 1977 schedule; the government asserts "that no general disposal of FBI headquarters records ever has taken place." Government's Opening Brief at 14 (citation omitted).

We do not believe that this hiatus warrants our passing over the 1977 schedule. NARS has approved the schedule in accord with the requirements of § 3303a. There is nothing in the language of § 3303a(c) that suggests that NARS and the FBI could not put the 1977 schedule into effect after seeking Congress' advice (especially after getting no response). Indeed, the FBI would be in violation of the records regulations if it does not have a records disposition program[55] covering headquarters files and "a

---

53. *Cf.* 41 C.F.R. § 101–11.405–2(b) (1982) ("A series of records designated 'permanent' in an agency records schedule approved by NARS *after May 14, 1973,*" warrants preservation.) (emphasis added).

54. The government cannot "piggyback" the 1977 schedule on the 1946 schedule for field office files because the 1977 schedule dealt primarily with headquarters files.

55. It is important to recall that a records disposition program is necessary for proper preservation practices as well as to permit destruction; the term "records disposition" is defined to include transfers to the National Archives, other federal agencies, and federal records centers, as well as to destruction or donation. 44 U.S.C. § 2901(5). *See also* 41 C.F.R. § 101–11.403–2 (1982) (providing the basic elements

comprehensive records schedule for all records in its custody." 41 C.F.R. § 101–11.-404–1(a) (1982). "Formulation and application of these schedules is mandatory." *Id.* § 101–11.404–1 (citing §§ 3303, 3303a).[56] If the 1977 schedule is meaningless and headquarters files are left out of the FBI records program, the district court was correct to take action to force NARS and the FBI to abide by the regulations and to develop a headquarters records schedule.

In sum, we find that NARS does not have a statutory duty to inspect FBI records, but has a duty under § 3303a to examine the FBI's records disposition schedules and to reject the schedules if they do not meet the preservation and disposal standards. As discussed above, the Director of the FBI also has a duty under § 3101 to preserve certain agency records. The regulatory process and standards governing the preparation and evaluation of these schedules has changed slightly over the past ten years. But the changes in regulations have not been significant for purposes of our review: The FBI has continually had the duty to prepare records disposal schedules for at least all major groups of its records (both headquarters and field office systems should have been addressed), and NARS has continually had the duty to examine the

schedules to ensure that they meet the disposition standards. Therefore, we must review the FBI's three records disposition schedules—1975, 1976, 1977—to determine whether the FBI and NARS have properly carried out their statutory responsibilities.

### 3. *Review of Agency Action*

#### a. *The 1975 and 1976 Schedules*

 The 1975 [57] and 1976 [58] schedules provide almost no explanation of why the FBI sought to destroy field office materials. The only two nuggets of guidance we can mine from these schedules are that the "[f]iles no longer possess sufficient reference or evidentiary value to merit retention" (1975), and "[t]he originals, duplicates or summarizations of substance … are contained in the permanent files of the [FBI] Headquarters" (1976). J.S.A. at 362A, 369. The 1975 comment only parrots part of the statutory standard to be met. The 1976 statement only tells us that some originals and copies of field office files are sent to headquarters while other files are summarized—without explaining which types of records receive which treatment, the reason for using summaries in some situations, and the information that should be incorporated in the summaries. Neither

---

that should be included in each agency's records disposition program).

**56.** The requirement to formulate disposal schedules for agency records is not new. It was in effect at the time NARS approved the 1975, 1976, and 1977 schedules. 41 C.F.R. § 101–11.403–2(a) (1977) ("Formulation and application of these [records control] schedules … is mandatory …."). *See also id.* § 101–11.401–3 (describing the necessary steps for the development of records control schedules).

**57.** The 1975 schedule description states:
Files, index cards, and related material which are maintained in FBI Field Offices pertaining to cases in which there was no prosecutive action undertaken; perpetrators of violations not developed during investigation; or investigation revealed allegations were unsubstantiated or not within the investigative jurisdiction of the Bureau. These investigations closed in field offices and correspondence not forwarded to FBI Headquarters [sic]. Files no longer possess sufficient reference or evidentiary value to merit retention. J.S.A. at 369.

**58.** The 1976 schedule description states:
Closed files of the Federal Bureau of Investigation Field Division containing investigative reports, inter- and intra-office communications, related evidence, notes, photographs, documents and correspondence prepared, collected or received during the course of public business in accordance with the FBI investigative mandate.
The originals, duplicates or summarizations of substance from closed files are contained in the permanent files of the Federal Bureau of Investigation Headquarters until further disposition is made in accordance with authority contained in the Records Control Schedule. (This is an extensive and broadening of disposal schedule # 346–S237, approved 3/5/46, to cover changes in reporting requirements wherein only data of substance is forwarded to Headquarters and other related material no longer serves a useful purpose.)
J.S.A. at 362A.

schedule provides an explanation of what factors were considered in arriving at the conclusion that the records listed do not "have sufficient administrative, legal, research, or other value to warrant their continued preservation." 44 U.S.C. § 3303a(a). In addition, there is no explanation of why these records need not be preserved "to furnish the information necessary to protect the legal and financial rights . . . of persons directly affected by the [FBI's] activities," *id.* § 3101, even though the FBI surely realizes that its activities affect citizens' legal rights often and significantly.[59]

The 1975 and 1976 schedules also do not articulate any connection between factual findings about the nature of the information in these records (or why certain types of summaries suffice under the preservation and disposal standards), and the decision to classify the records as without appropriate value and thereby as suitable for destruction. The two schedules make it clear that the FBI was only concerned about preserving records that might serve its own institutional needs.

We are not insisting that the FBI must necessarily preserve "raw investigative data." What we ask for, and what the "arbitrary and capricious" test of the APA requires, is some reasoned justification explaining why certain types or categories of investigative data should be destroyed under the preservation standard of § 3101 and the disposal standard of § 3303a. The same sort of justification is necessary to explain the FBI's decisions, with NARS' approval, to retain summaries of field office files and to destroy the original documents upon which the summaries are based. We do not disagree with the government's general point that the FBI may satisfactorily summarize much investigative data. But the summaries need to account in some reasonable fashion for historical research interests and the rights of affected individuals—not just the FBI's immediate, operational needs.

We suspect that decisions on which field office files to preserve and what summaries are sufficient might depend on factors such as the type of investigation and alleged crime, the individuals involved, and the connections to events of historic interest. But it is not our role to dictate explanatory criteria for disposal decisions; this was the task NARS and the FBI should have performed within the requirements of §§ 3101, 3303, 3303a.

The district court found that the FBI's disposal schedules for field office files were based on an incorrect assumption by the FBI and NARS that all field office documents were duplicated at FBI headquarters. We acknowledge the government's objection on this point, but we do not find this debate over the meaning of "duplication" to be central here. Even if all the pertinent employees of the FBI and NARS recognized that the concept of duplication included summarization, the FBI or NARS would still need to explain, as they have not, why these summaries justified destruction of the underlying field office documents. This justification would have to address the means through which the FBI determined, for different types of records, that the information that must be preserved under §§ 3101, 3303a would be part of the summaries.

The government also seems to make the argument that no explanation for the 1975 and 1976 disposal schedules is necessary because Congress approved the laconic 1946 schedule under the same preservation standard carried forward by § 3303a. Again, this would neatly exclude future disposal of FBI field office files from § 3303a examination—and, understandably, we cannot reconcile that result with Congress' actions after 1946. Congress imposed the § 3101 preservation duty in 1950; surely we must hold subsequent schedules to its standard. Congress also gave NARS the job of evaluating disposal requests in 1970

---

**59.** Section 3101 is cited both in the present regulation that requires agency heads to establish and maintain a records disposition program, *see* 41 C.F.R. § 101–11.403–1 (1982), and in the predecessor regulation that was in effect at the time NARS approved the 1975, 1976, and 1977 schedules, *see id.* § 101–11.403–1 (1977).

because the members of the Joint Committee on the Disposition of Executive Papers admitted that for years they had had no idea of what they were approving.[60] Even rarified judicial air will not permit us to rely on such a perfunctory congressional "approval," granted 30 (and now almost 40) eventful years ago, and agreed to without consideration of the statutory standards in effect today.

■ The 1975 and 1976 schedules do not even meet the government's own standards of explanation as established in its regulations. The regulations in effect at the time NARS approved the two schedules stated that "[a]ll schedules shall take into account the actual filing arrangements in existence." 41 C.F.R. § 101–11.401–3(c) (1977). In addition, schedules were to "clearly identify and describe the series of records covered, ... contain instructions that ... can be readily applied," and "be readily adaptable ... so that each office will have standing instructions for the disposition or retention of records in its custody." *Id.* § 101–11.-401–3(b). The present regulations contain similar requirements for the comprehensive schedules that agencies are supposed to have in place today. *See id.* § 101–11.404–1(a) (1982). The 1975 and 1976 schedules, however, do not even refer to the almost 200 basic classifications in the FBI's central records system. The records identification and disposal instructions are broad enough to justify wholesale destruction or selective, standardless retention on the basis of "administrative needs." *See* J.S.A. at 362A, 369; Plaintiffs' Exhibit 21.

We do not see how NARS could have made a rational evaluation and determination of the FBI's records disposal proposals on the basis of these schedules. If NARS had undertaken a thorough investigation, it might have been able to compensate for the lack of *explanation* in the schedules by providing its own justification for our review. But NARS did not do so.[61] Moreover, the

**60.** *See, e.g.,* 116 Cong.Rec. 3309 (1970) (statement of Rep. Nedzi, cosponsor of the bill and member of the Joint Committee on the Disposition of Executive Papers) ("[T]his subcommittee did not have anything to say about disposing of the papers anyway. We did not know what they were. I, as a member ..., received a list of numbers from the executive department. When I made some inquiry as to what I was signing to be disposed of, nobody knew.... [T]he subcommittee was performing an absolutely useless function."); *id.* at 3310 (statement of Rep. Nedzi) (The joint committee on disposition has "no chairman, no separate staff, and no meetings. Indeed, I am told that the committee has not met in at least the past 14 years."); *id.* at 3309 (statement of Rep. Hansen) ("As a practical matter ... approval by the joint committee ... can be nothing more than perfunctory since it is impossible to review and evaluate even the smallest portions of ... records involved.").

**61.** NARS did not provide any additional justification for the 1975 and 1976 schedules at the time it approved them. In 1978, after a series of articles raised concerns about the destruction of FBI records, NARS conducted an evaluation of field office disposal practices. This study resulted in a December 1978 report that suggested some minor changes in the FBI field office records disposal schedules. *See* n. 47, *supra;* Defendants' Exhibit 32.

NARS' 1978 report discusses FBI disposal practices in greater detail than do the disposal schedules, but its treatment of investigative data and field office files still reflects an insensitivity to research needs that do not correspond to the FBI's purposes for retaining records. In discussing field office records that should be preserved in headquarters files, the report stated approvingly that the FBI documented "productive aspects" of investigations that were of "value in bringing a case to a logical conclusion." Defendants' Exhibit 32, section IV at 5. Records of interviews, surveillance, searches, and evidence that were not of such value may or may not be summarized, and the primary materials would be left in field office files slated for eventual destruction. *See id.* NARS did not consider that certain records may be of particular interest to historians, researchers, or other private parties even though the records were not of value to the FBI in making investigative decisions. This approach toward records preservation is too limited. For example, a researcher may find an FBI informant's reports on his involvement with the Ku Klux Klan of great historical value (or related to private rights) even though those reports may not have helped the FBI to make an investigative decision.

NARS' assumption that FBI headquarters summaries are always sufficient to maintain all information of value involves a similar oversight: In certain cases that invoke substantial public or historical interest, it will be valuable for researchers to examine primary source material instead of relying on secondary source

schedules would still fail to include any reasonable *instructions* for records disposal that could ensure that the §§ 3101, 3303a preservation and disposal requirements would be observed. It is almost inconceivable that any explanation could justify these broad disposal instructions. Furthermore, "[t]he reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 103 S.Ct. at 2867 (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. at 285–86, 95 S.Ct. at 441–42 and citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). NARS simply has not explained why it exercised its discretion to approve the 1975 and 1976 schedules, which definitely do not carry the weight of a justifiable explanation themselves.

#### b. *The 1977 Schedule*

The 1977 schedule is a more complete effort than the 1975 and 1976 versions. *See* J.S.A. at 384–96. It begins by describing the content and arrangement of the central records system, including the approximately 200 core classifications (generally by type of violation) for subject matter files. *See id.*

at 384, 391–96. But the schedule refers to that system only twice: to state that administrative files (covering policies and procedures) of each classification will be preserved permanently, and to explain that the criminal, security, and applicant investigative files under 18 classifications (and all classifications created in the future) will be subject to "specific retention guidelines" determined by NARS. *Id.* at 386, 390. The schedule does not explain why the 18 classifications warrant special guidelines.

In general, investigative files warrant permanent retention under the schedule if they meet one of five criteria. *See id.* at 387–88.[62] The schedule admits that "the criteria [are] general in nature and selection is basically a matter of informed judgment." *Id.* at 387. The schedule divides investigative files that do not merit permanent retention into four groups (criminal, security, applicant, and conflicts with the Privacy Act of 1974) and assigns each a time for eventual destruction. *See id.* at 388–89. "Transitory documents such as airtels, teletypes, [and] memoranda," the substance of which has been incorporated in more permanent documents, should be destroyed after the "transitory document[s] no longer serve[ ] a useful purpose." *Id.* 389–90. The schedule also notes that authority already exists to destroy field office records because headquarters files contain

---

summaries. In some cases, summaries cannot be trusted to address all important research issues that may arise, especially when the summaries are prepared with the FBI's objectives in mind. The 1978 report does not address this issue at all. The 1978 report also fails to show any awareness of the § 3101 requirement to preserve information related to the legal rights of parties directly affected by the FBI's actions.

In sum, the 1978 report does not provide a suitable subsequent reasoned justification for NARS' approval of the 1975 and 1976 disposal schedules and, insofar as it provides some explanation for disposal practices, it does not require new instructions in the schedules to ensure that FBI personnel will preserve the appropriate records.

**62.** The five criteria are:
1. The investigation or case has significant impact on law enforcement policies or procedures, agency rules or regulations, or investigative and intelligence techniques;

2. The investigation or case involves an actual or potential breakdown of public order (civil disturbance) of major proportions;
3. The investigation or case directly involves a full-field investigation for: (a) a subversive or extremist organization, with or without foreign connections; or (b) a person or persons holding a major leadership position within such an organization;
4. The investigation or case directly involves a person, element, or organization whose activities are deemed to pose a substantial and compelling threat to the conduct of national defense or foreign policy;
5. The investigation or case is significant in terms of intensity of public interest, expressed by (a) a demonstrated interest of a Congressional committee or the Executive Office of the President, or (b) a high degree of national media attention.

J.S.A. at 387–88.

or summarize the information from them that should be retained. *See id.* at 390.

Clearly the heart of the schedule is the list of five criteria employed to screen permanent investigative files. The district court found "these criteria [to be] excessively and unnecessarily vague." *American Friends Service Committee v. Webster,* 485 F.Supp. at 231 (footnote omitted). The district court believed that such vagueness was necessary because the schedule could have drawn on the approximately 200 file classifications (by type of crime) "to define more specifically the criteria for retention of files." *Id.* at 231 n. 23. We agree that the schedule would be improved if it incorporated the specificity of the subject matter classifications. This integration would also better serve the requirement in the regulations to "take into account the existing filing system so that destruction or transfer can be handled in blocks." 41 C.F.R. § 101–11.-404–1(a)(4) (1982). However, we do not find the schedule's criteria to be so vague as to be "arbitrary and capricious." The criteria provide sensible guidance to agency personnel who are supposed to be sensitive to archival and historical values; they also reflect some consideration of research interests other than those of the FBI.

We also do not accept the district court's finding that the 1977 schedule was in some way tainted because the FBI and NARS, in the course of developing the schedule, discussed the fact that there would be administrative burdens associated with the FOIA. We cannot expect agency recordkeepers to remain oblivious to major legislation that will materially affect their jobs. Indeed, they would not be serving the records statutes' objectives relating to efficient management unless they considered such events. Absent some indication that a desire to avoid FOIA responsibilities led the FBI to schedule the destruction of records that should have been preserved, we will examine the schedules for compliance with the law without a presumption of wrongful intent.

There are, however, three respects in which the 1977 schedule falls short. First, the schedule does not take into account the § 3101 requirement to preserve information pertaining to the legal rights of persons directly affected by the FBI's activities. Second, the schedule's treatment of "transitory documents," like its few comments about field office files, does not reveal a glimmer of recognition that these records may be of administrative, legal, or research value—or that they might contain important information about how the FBI affected individuals' legal rights. We need some explanation of why these records (or which ones) need not be preserved. Third, the schedule fails to provide any reason why 18 classifications (and all new ones) are excluded from disposition standards for criminal, security, and applicant investigative files. It is far from obvious to us why NARS needs to determine specific retention guidelines for records classifications as diverse as "Training Schools," "Subversive Matter (Individuals)," and the "Labor Management Relations Act, 1947." J.S.A. at 391, 394.

In sum, the 1977 schedule fails in three respects to justify NARS' approval. And NARS has not provided any other suitable justification. NARS' approval of the 1977 schedule does not comport with its obligation under § 3303a, and the FBI's submission of the schedule reveals that it overlooked its records preservation and disposal duties under §§ 3101, 3303.

### 4. Conclusion

Our analysis of the alleged records disposal violations reveals that NARS does not have a duty to inspect FBI records, but does have a statutory responsibility to subject the FBI's proposed disposal schedules to critical scrutiny to ascertain whether they are in accord with the statutory standards of §§ 3101, 3303a. In addition, the FBI has the duties to preserve certain record information under § 3101 and to propose the disposal of records in conformity with the requirements of § 3303. Neither NARS nor the FBI performed their statutory re-

sponsibilities properly with respect to the preparation and approval of the 1975, 1976, and 1977 disposal schedules. The 1975 and 1976 disposal schedules for field office records are wholly deficient. The 1977 disposal schedule for FBI headquarters records is partially unsatisfactory for three reasons we explained above. Since NARS and the FBI have not amended these three disposal schedules to correct their noncompliance with the statutory standards and approval requirements, we conclude that the FBI's records disposal program is in violation of the records disposal laws.

▮▮▮ After the district court found that the FBI and NARS had not carried out their statutory responsibilities, the court required them to formulate and submit to it a records retention plan and disposal schedules consistent with that plan. *American Friends Service Committee v. Webster*, 485 F.Supp. at 236. When the district court determined at a hearing over a year later that NARS and the FBI had not taken significant action to carry out the court's mandate, the court issued a more detailed order designed to insure compliance with the records disposal laws. *See American Friends Service Committee v. Webster*, No. 79–1655, mem. op. at 3, 5–8 (D.D.C. June 9, 1981), *reprinted in* App. at 41, 43–46. In light of NARS' and the FBI's inability or unwillingness to begin remedying the noncomplying disposal schedules over the course of a year, we believe the district court was within its authority to issue that detailed order and we will not disturb it except as explained in Part VI, which follows. While we have found that records inspections by NARS are not required by statute, we will not interfere either with the district court's discretion to order inspections to insure compliance with its mandate in this case. However, the district court's evaluation of the proposed FBI disposal schedule for headquarters records should take into account our finding that the FBI's 1977 schedule for headquarters files is deficient in only three respects, as explained above.

GINSBURG, Circuit Judge:

## VI. RESTRICTED USE RECORDS

After the district court's January 10, 1980, order enjoining destruction of FBI records,[63] the government filed a series of modification requests. Several of the government's requests were granted. The appeal in No. 83–1025 concerns three requested modifications that the district court denied.

The district court's June 9, 1981, order directed the FBI to open for inspection by NARS files and records covered by the January 10, 1980, injunction. Three categories of records, the government maintains, are immunized by law from the Archives' inspection access: tax returns and tax return information; grand jury materials; and electronic surveillance materials. In an order and memorandum filed October 20, 1982, the district court ruled that the FBI must allow NARS to inspect the records in question. *American Friends Service Committee v. Webster*, No. 79–1655 (D.D.C. filed Oct. 20, 1982) ("Mem. op. of Oct. 20, 1982"), *reprinted in* J.S.A. at 62–78.[64] The government seeks our review of that ruling.

We hold that the district court erred in denying the three modifications at issue. As we read the centrally relevant statute, 44 U.S.C. § 2906, tax returns and tax return information, grand jury materials, and electronic surveillance materials are restricted records open to NARS inspection for records management purposes only on

---

**63.** *American Friends Service Committee v. Webster*, 485 F.Supp. 222 (D.D.C.1980).

**64.** *See also American Friends Service Committee v. Webster*, No. 79–1655 (D.D.C. June 9, 1981) ("Mem. op. of June 9, 1981"), *reprinted in* App. at 39–51. The district court also held in its October 20, 1982, decision that documents in the FBI's custody belonging to private parties may be returned to their owners once they have outlived their usefulness to the FBI or the U.S. Attorney; neither the documents nor copies of them need be held for screening by the Archives. Further, the district court permitted the FBI to conceal informants' names from NARS inspectors. No appeal has been taken from these rulings.

approval of the Director of the FBI or the President.

## A. *The Relevant NARS Function*

Pursuant to the Administrator of GSA's delegation,[65] NARS performs four distinct functions. The appeal in 83–1025 dominantly concerns the function we list fourth. First, and probably best known to the public, NARS accepts for deposit in the National Archives records the Archivist determines "to have sufficient historical or other value to warrant their continued preservation by the United States Government." 44 U.S.C. § 2103(1). In this "archival administration" role, NARS may "direct and effect the transfer to the National Archives . . . of records of a Federal agency that have been in existence for more than thirty years." *Id.* § 2103(2) (Supp. V 1981). Second, the Archives has a recordkeeping and servicing function; it maintains and operates "records centers [at which files are stored] and centralized microfilming services for Federal agencies." *Id.* § 2907. Third, NARS reviews lists and schedules submitted by agency heads proposing disposal of records that do not appear to have sufficient value to warrant preservation. *Id.* §§ 3303, 3303a. Finally, and directly at issue here, the Archives has a "records management role," which entails responsibilities for guiding and assisting "Federal agencies with respect to records creation, records maintenance and use, and records disposition." *Id.* § 2904.

The provision on which the appeal in No. 83–1025 centers, 44 U.S.C. § 2906, authorizes NARS to "inspect the records . . . of any Federal agency solely for the purpose of rendering recommendations for the improvement of records management practices and programs." *Id.* § 2906(a)(1). The controversy we now address turns on what Congress intended when it qualified the general authority of the Archives to inspect

agency records for records management improvement purposes by specifying:

> Records, the use of which is restricted by law or for reasons of national security or the public interest, shall be inspected, in accordance with regulations promulgated by the [Archives], subject to the approval of the head of the agency concerned or of the President.

*Id.* § 2906(a)(2).

■ We explain first why we conclude that part of what Congress meant is not in doubt in this case: The description, "[r]ecords, the use of which is restricted by law," fits each of the record categories in question, and the laws restricting use contain no exception for records management inspection by the Archives. Next, we treat the critical, less readily answered issue: What authority did Congress vest in "the head of the agency concerned or . . . the President" with respect to the Archives' inspection, again for records management purposes, of "restricted use" records?

## B. *The Relevant Laws Restricting the Use of Records*

### 1. *Tax Returns and Tax Return Information*

■ The government's motion to exclude tax returns and tax return information in FBI files from the Archives' records management inspection rests on section 6103 of the Internal Revenue Code, 26 U.S.C. § 6103.[66] This large section comprehensively regulates the use and dissemination of tax returns and return information. The section opens with a statement of the main rule that returns and return information "shall be confidential." *Id.* § 6103(a). A primary purpose of the measure was to limit and control access to such information by government entities. *See Chamberlain v. Kurtz,* 589 F.2d 827, 835 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979).[67]

---

**65.** *See* n. 2, *supra.*

**66.** Section 6103 was added to the Code by § 1202 of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1525.

**67.** *See generally* S.Rep. No. 94–938, 94th Cong., 2d Sess., pt. I, 315–18 (1976), U.S.Code Cong. & Admin.News 1976, p. 2897.

Section 6103 is a formidable law restricting the use of records. It contains many subsections listing persons and entities to whom disclosure may be made for specified purposes or under defined circumstances.[68] The district court regarded subsection (n) as authorizing the NARS inspection at issue.

Subsection 6103(n) provides:

Pursuant to regulations prescribed by the Secretary, returns and return information may be disclosed to any person . . . to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, and the programming, maintenance, repair, testing, and procurement of equipment, for purposes of tax administration.

26 U.S.C. § 6103(n). The district court said of this provision: "On its face, the use of the word 'storage' appears to encompass the very sort of access envisioned by the archival statutes." Mem. op. of June 9, 1981, at 9, *reprinted in* App. at 47. The subsection does relate to one of the Archives' functions: returns and return information may be transferred *for storage* to a records center maintained and operated by NARS. *See* 44 U.S.C. §§ 2907, 3103.[69] But the Archives' storage or warehousing function is distinct from its records management function.[70] Subsection 6103(n) authorizes disclosure to any person *to the extent necessary* to the performance of the listed services. Inspection of the contents of documents is not "necessary in connection with" their storage. Congress expressly authorized inspection of agency records in conjunc-

tion with the Archives' records management function; it did not say inspection should occur when NARS stores an agency's documents at a records center. *Compare* 44 U.S.C. § 2906 *with id.* §§ 2907, 3103.

Subsection 6103(n), moreover, authorizes disclosure to persons who perform record-keeping services "for purposes of tax administration." *See* 26 U.S.C. § 6103(b)(4) (defining "tax administration"). The inspection the district court ordered would serve no tax administration purpose. Instead, the order's objective is improvement of the FBI's records management practices and programs.[71] Further, disclosure under subsection 6103(n) is to occur "[p]ursuant to regulations prescribed by the Secretary [of the Treasury]." The Secretary's regulations, Treas.Reg. § 301.6103(n)–1, contain no prescriptions about records management inspection by the Archives.

In sum, section 6103 concededly restricts the use of tax returns and tax return information. We have located no provision in the section that authorizes NARS inspection for the records management purpose at issue in this case.

### 2. Grand Jury Materials

▆ Federal Rule of Criminal Procedure 6(e) states a general rule of secrecy shielding from disclosure "matters occurring before a grand jury." Codifying a restraint "older than our Nation itself," *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323

---

**68.** For provisions authorizing disclosure to the FBI, see 26 U.S.C. § 6103(g)(2), (i)(1), and (i)(2).

**69.** Congress made no specific reference to NARS in § 6103. It apparently sought, through § 6103(n), to provide statutory authorization for the Internal Revenue Service's practice of contracting with private companies for the various recordkeeping services listed in the subsection. The Senate Report referred to § 6103(n) as authorizing "disclosures to contractors who perform processing, storage, transmission, reproduction, programming, maintenance, testing, or procurement of equipment services for the IRS." S.Rep. No. 94–938, pt. I, *supra,* at 344. *See also id.* at 341.

**70.** Nor should NARS' storage function be confused with its "archival administration" function. *Compare* 41 C.F.R. § 101–11.410–7 (1982) (records stored in Federal Records Centers are "considered to be maintained by the agency which deposited [them]") *with* 41 C.F.R. § 101–11.411–2 (1982) ("[NARS] is responsible for the custody, use, and withdrawal of records [accessioned into the Archives].").

**71.** Internal Revenue Service management processes for controlling access to tax returns and tax return information are treated at length in 26 U.S.C. § 6103(p).

(1959), Rule 6(e) unquestionably qualifies as a law restricting the use of records. The Rule lists four exceptions:

Disclosure ... may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

. . . .

Disclosure ... may also be made—

(i) when so directed by a court preliminarily to or in connection with a judicial proceeding; or

(ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

Fed.R.Crim.P. 6(e)(3)(A), (C). None of these exceptions addresses records management inspections by the Archives.

Appellees do not suggest, nor could they reasonably do so, that inspection by the Archives qualifies under the exceptions for government attorneys, personnel assisting government attorneys in the performance of criminal law enforcement duties, or defendants who show that grounds for dismissal of an indictment may exist. They assert, however, that the exception listed third applies here: "[U]nder the very terms ... of Rule 6, the district court was empowered to determine that it was necessary in connection with this judicial proceeding to have the Archives examine records of the FBI made up of grand jury transcripts and material." Brief for Appellees at 28.

We reject appellees' potentially rule-swallowing reading of the "judicial proceeding" exception. Rule 6(e)(3)(C)(i) disclosure orders are appropriate "to avoid a possible injustice in *another* judicial proceeding." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979) (emphasis added). The phrase "in connection with a judicial proceeding" does not indicate "the very proceeding instituted for the purpose of obtaining disclosure." *Hiss v. Department of Justice,* 441 F.Supp. 69, 70 (S.D.N.Y.1977), *quoted in Fund for Constitutional Government v. NARS,* 656 F.2d 856, 868 (D.C.Cir. 1981). The limitation of Rule 6(e)(3)(C)(i) to requests in aid of a claim or defense in *another* proceeding has been reiterated most recently in *United States v. Baggot,* —— U.S. ——, ——, 103 S.Ct. 3164, 3166, 77 L.Ed.2d 785 (1983).[72] Thus we cannot entertain appellees' argument that Rule 6(e) includes an exception for a claim such as this one in which uncovering confidential grand jury materials is part of the ultimate relief sought in the action.[73]

### 3. *Electronic Surveillance (Title III) Materials*

■ Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, authorizes the use of electronic surveillance in the investigation of certain serious offenses specified in 18 U.S.C. § 2516. *See generally United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The use and disclosure of materials obtained pursuant to Title III is governed by 18 U.S.C. § 2517. With exceptions not relevant here, disclosure or use of Title III materials other than as provided by section 2517 is unlawful. *See*

---

**72.** The Court stated that the use for which disclosure is sought must be "related fairly directly to some identifiable litigation." *Baggot,* —— U.S. at ——, 103 S.Ct. at 3166. An argument that NARS must now inspect (for records management purposes) the grand jury materials at issue therefore cannot rest on an assertion that those materials may be supportive of claims, not yet identified, appellees eventually may bring to court.

**73.** We note too that appellees have not made, and are not now positioned to make, the requisite "strong showing of particularized need" upon which a Rule 6(e)(3)(C)(i) disclosure order, whether sought by a private party or a government agency, depends. *See United States v. Sells,* —— U.S. ——, ——, 103 S.Ct. 3133, 3147, 77 L.Ed.2d 743 (U.S.1983).

18 U.S.C. § 2511(1)(c), (d). Section 2517 provides in pertinent part:

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

Here too, we see no room for debate concerning the qualification of the materials in question as "[r]ecords, the use of which is restricted by law." 44 U.S.C. § 2906(a)(2). Nor do we find in 18 U.S.C. § 2517 authorization for NARS records management inspection of Title III intercepts.

The section 2517 subsections set out above permit, respectively, disclosure of electronic surveillance materials to, and use of the materials by, investigative and law enforcement officers in the proper performance of official duties. Congress, the legislative history securely indicates, had in mind information sharing "within the law-enforcement community." S.Rep. No. 1097, 90th Cong., 2d Sess. 99 (1968), U.S.Code Cong. & Admin.News 1968, p. 2112. *See also id.* at 91. It envisioned "use of the contents of intercepted communications, for example, to establish probable cause for arrest, to establish probable cause to search, or to develop witnesses." *Id.* at 99 (citations omitted). *See also* 18 U.S.C. § 2518(8)(a) ("Duplicative recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter *for investigations.*") (emphasis added). Records management inspection by the Archives hardly

fits within the criminal law investigation and enforcement objectives Congress sought to serve in allowing shared access to and use of Title III materials by law enforcement officers. *See* 18 U.S.C. § 2510(7) (defining "investigative or law enforcement officer").

Moreover, 18 U.S.C. § 2518(8)(a) provides that, upon expiration of the period of the surveillance order, the recordings

shall be made available to the judge issuing [the order that authorized the surveillance] and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years . . . .

*See also United States v. Abraham,* 541 F.2d 624, 627 (6th Cir.1976) (Title III materials must be treated as "confidential court records"). The order before us for review, to the extent that it directs inspection of Title III materials, is not in harmony with the controlling role Congress assigned to the district judge who superintended the surveillance.

### C. *The Meaning of Section 2906*

The qualification of 26 U.S.C. § 6103, Rule 6(e) of the Federal Rules of Criminal Procedure, and 18 U.S.C. §§ 2511, 2517, 2518 as laws restricting the use of records is evident, and we have found no provision in those laws authorizing the Archives to inspect the shielded records to improve their management by the FBI. But the district court's refusal to remove tax returns and return information, grand jury materials, and electronic surveillance materials from the records the FBI must open to the Archives' inspection ultimately did not rest upon that court's interpretation of the restricted use laws in question. Rather, the district court ruled as it did because it believed Congress, in 1976, had taken action overriding, *pro tanto,* laws restricting the use of records.

Through 1976 amendments to 44 U.S.C. § 2906, the district court thought, Congress effectively withdrew records management

inspections by NARS from the governance of laws restricting access to the records of federal agencies. Such inspections, after the 1976 alteration of section 2906, the district court determined, simply would not constitute "disclosure" under laws that shield records: "44 U.S.C. [§] 2906(a)(2) specifically authorizes inspection of records 'the use of which is restricted by law . . . .'" Mem. op. of Oct. 20, 1982, at 13, *reprinted in* J.S.A. at 76. *See also* J.S.A. at 75; Mem op. of June 9, 1981, at 9–11, *reprinted in* App. at 47–49. We think the district court misapprehended what Congress meant when it formulated section 2906(a)(2).

Prior to 1976, section 2906 read:

*Personal inspection and survey of records*

The Administrator of General Services may inspect or survey personally or by deputy the records of any Federal agency, and make surveys of records management and records disposal practices in agencies. Officials and employees of agencies shall give him full cooperation in inspections and surveys. Records, the use of which is restricted by law or for reasons of national security or the public interest, shall be inspected or surveyed in accordance with regulation[s] promulgated by the Administrator, subject to the approval of the head of the custodial agency.

Act of Oct. 22, 1968, Pub.L. No. 90–620, § 2906, 82 Stat. 1238, 1297 (amended 1976). As altered by the Federal Records Management Amendments of 1976, Pub.L. No. 94–575, § 2(a)(3), 90 Stat. 2723, 2725–26, section 2906 today provides:

*Inspection of agency records*

(a)(1) In carrying out his duties and responsibilities under this chapter, the Administrator of General Services or his designee [the Archives] may inspect the records or the records management practices and programs of any Federal agency solely for the purpose of rendering recommendations for the improvement of records management practices and programs. Officers and employees of such agencies shall cooperate fully in such in-

spections, subject to the provisions of paragraphs (2) and (3) of this subsection.

(2) Records, the use of which is restricted by law or for reasons of national security or the public interest, shall be inspected, in accordance with regulations promulgated by the Administrator, subject to the approval of the head of the agency concerned or of the President.

(3) If the Administrator or his designee inspects a record, as provided in this subsection, which is contained in a system of records which is subject to section 552a of title 5 [the Privacy Act], such record shall be—

(A) maintained by the Administrator or his designee as a record contained in a system of records; or

(B) deemed to be a record contained in a system of records for purposes of subsections (b), (c), and (i) of section 552a of title 5.

(b) In conducting the inspection of agency records provided for in subsection (a) of this section, the Administrator or his designee shall, in addition to complying with the provisions of law cited in subsection (a)(3), comply with all other Federal laws and be subject to the sanctions provided therein.

The district court believed that, by "explicitly reiterat[ing] the comprehensive scope of the Archives' mandate" in subsection 2906(a)(1), and "add[ing] specific provisions for the protection [from disclosure to others] of information within the review of the Archives" in subsections 2906(a)(3) & (b), Congress resolved "the tension between archival and privacy statutes." Mem. op. of June 9, 1981, at 10, *reprinted in* App. at 48. Congress did so, the district court concluded, by emphasizing that the Archives had a broad mandate to inspect records to make recommendations for improving federal agencies' records management practices; in carrying out its large authority, however, the Archives would be subject to the strictures contained in the Privacy Act of 1974 and other federal laws prohibiting disclosure of information that inspections uncovered.

Under the district court's reading, and as appellees urge, section 2906(a)(2) "deals with the unlikely event that the head of the agency and the Archivist cannot agree upon the procedures for carrying out the inspection. Then it is the President who will provide the procedures and method to be applied." Brief for Appellees at 13–14. This view finds some support in the Senate Government Operations Committee Report on the Federal Records Management Amendments of 1976. The district court emphasized this passage from the Committee's Report:

> The Committee desired to reiterate its position that the GSA Administrator or his designee would have the authority to inspect records in order to make recommendations for improving records management practices and programs. At the same time, the Committee intended to make clear that protections contained in the Privacy Act of 1974 regarding the disclosure of personal information apply to such activities of GSA. Due to the large and broad mandate given to the GSA to inspect the records of other Federal agencies and the requirement that such agencies give the GSA full cooperation in such inspections, it was felt that strong protection be provided for the protection of the personal information maintained about citizens which might be kept in certain government files.

S.Rep. No. 94–1326, 94th Cong., 2d Sess. 6 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6150, 6155, *quoted in* Mem. op. of June 9, 1981, at 10, *reprinted in* App. at 48. We note too that the phrase in section 2906(a)(2), "or of the President," was added by the 1976 amendments and occasioned this explanation from the Senate Committee: "By adding [that phrase], the statute provides for a clearly defined process in those instances where the Administrator and the agency head cannot agree on inspection procedures." S.Rep. No. 94–1326, *supra*, at 10, U.S.Code Cong. & Admin.News 1976, p. 6158.

In our view, the language of section 2906, originally and as amended, does not support the district court's interpretation, and we find the legislative history cloudy. Subsec-

tion 2906(a)(1), tracking the prior provision, states that the Administrator "*may* inspect the records . . . of any Federal agency solely for the purpose of rendering recommendations for the improvement of records management practices and programs." 44 U.S.C. § 2906(a)(1) (emphasis added). Subsection 2906(a)(2), again in large part tracking the prior provision, except for addition of the words "or of the President," states that restricted use records "*shall* be inspected, in accordance with regulations promulgated by the Administrator, subject to the approval of the head of the agency concerned or of the President." *Id.* § 2906(a)(2) (emphasis added). Appellees and, apparently, the district court read "subject to the approval of [the agency head or the President]" as modifying "regulations." The government reads the approval clause as modifying "shall be inspected." *See* Government's Supplemental Brief at 15.

If Plaintiff-appellees' reading of subsections 2906(a)(1), (2) is correct, the Archives would be permitted, but not required, to inspect records, use of which is *not* restricted by law, while NARS inspection of records, "the use of which is restricted by law," would be mandatory, subject only to settlement between the Archives and the agency head or the President of the procedures for carrying out the inspection. We would hesitate long before concluding that Congress *mandated* the Archives to inspect, for records management purposes, the nation's most sensitive and closely guarded records, and only those records. Absent an unmistakable legislative instruction to that effect, we resist the reading appellees urge. It seems to us far more plausible that Congress meant to limit, not to command, NARS records management review of restricted use records by conditioning such inspection on approval of the highest executive authorities—the agency head or the President.

Supporting our view, the Senate Committee Report states:

> [T]he only substantive change in the House-passed [version of section 2906] was to permit the President, as well as the agency head, to allow for the inspec-

tion of an agency's record[s] when the use of such records is restricted by law or for reasons of national security or the public interest.

S.Rep. No. 94–1326, *supra,* at 6, U.S.Code Cong. & Admin.News 1976, p. 6154. *See also* H.R.Rep. No. 94–1426, 94th Cong., 2d Sess. 8 (1976). Moreover, during floor debate on the 1976 amendments, Senator Percy, who played a prominent role in the revision of section 2906, said that subsection 2906(a)(2)

> requires the approval of the head of an agency or the President before [the Archives] may inspect records, the use of which is restricted by law or for reasons of national security or the public interest. When access is approved to such records, [the Archives] shall issue regulations to govern such inspections, subject to the approval of the agency head or the President.

122 Cong.Rec. 34559 (1976). We do not adopt Senator Percy's "double approval" interpretation—approval by the agency head or the President of both the inspection and the regulations setting procedures for its execution. But we do agree that section 2906, sensibly read, both before and after the 1976 reformulation, calls for top level executive approval before NARS undertakes inspection of restricted use records for purposes of improving agency management of such records.

The district court, as earlier observed,[74] regarded as highly significant the specifications in subsections 2906(a)(3) & (b) that, *if* NARS inspects a record, its inspection shall

comply with the Privacy Act and other federal laws. These specifications, the district court believed, showed that Congress envisioned NARS inspection in all cases without approval of the agency head or the President. We read subsections 2906(a)(3) & (b) as carrying less weight. In our view, they simply prescribe the care NARS is to take whenever it inspects records, whether pursuant to the general authorization in subsection 2906(a)(1) or, in the case of restricted use records covered by subsection 2906(a)(2), upon approval of the agency head or the President.

In sum, as we read section 2906, Congress did provide for a limited exception to laws restricting access to the records of federal agencies.[75] But the exception operates only when the agency head or the President determines that the Archives should inspect the records to assist the agency in their sound management. The Archives has general authority to inspect agency records to "render[ ] recommendations for the improvement of records management practices and programs," 44 U.S.C. § 2906(a)(1), but when use of the records in question has been "restricted by law or for reasons of national security or the public interest," *id.* § 2906(a)(2), inspection shall occur only upon "approval of the head of the agency concerned or of the President." *Id.*[76] In the event of such approval, inspection shall proceed "in accordance with regulations promulgated by the [Archives]," *id.,* and all inspections shall be conducted in conformity with the Privacy Act and other relevant federal laws, *id.* § 2906(a)(3), (b).

---

**74.** *See* pp. 74–75, *supra.*

**75.** The government suggests that "it is questionable whether even the head of the FBI or the President lawfully could permit NARS to have access to the three kinds of materials at issue in this appeal." Government's Supplemental Brief at 16. According to appellants, if records management inspection by the Archives is not permitted by the law restricting use, then the inspection is unlawful. We reject this view, for it would effectively nullify § 2906(a)(2).

When the original version of current § 2906 was enacted in 1950, Congress explained that the provision "continues existing statutory authority [to inspect records] but provides a limi-

tation with respect to surveying or inspecting records the use of which is restricted by law or for reasons of national security or the public interest." S.Rep. No. 2140, 81st Cong., 2d Sess. 14 (1950), U.S.Code Cong.Serv. 1950, p. 3561. *See* Federal Records Act of 1950, ch. 849, § 505(c), 64 Stat. 583, 585 (amending Federal Property and Administrative Services Act of 1949, ch. 288, 63 Stat. 377). Were we to adopt the government's view, the "limitation" Congress intended would be transformed into an absolute prohibition on NARS records management inspection of restricted use records.

**76.** The government asserts that the FBI is not "the agency concerned" with respect to the records in question because grand jury and Title III materials are court records, and tax

In this case, because neither the FBI Director nor the President has approved inspection by the Archives, we hold that the district court lacked authority to order a NARS records management review of the restricted use records in question. This is not to say that the district court must refrain from insisting that the FBI and the Archives deal with the FBI's management of tax returns and return information, grand jury materials, and electronic surveillance materials. These records are indeed appropriately considered in framing a records retention plan for the FBI. We hold only that in developing the plan, means other than inspection of the restricted use records must be employed.

We note, finally, that our holding does not deal with NARS' "archival administration" function, governed by 44 U.S.C. §§ 2101–2114. The dispute before us requires a ruling on the Archives' authority to inspect agency records, for management purposes, while they remain in the agency's possession. Nothing we decide today bears on NARS' statutory authority to "direct and effect the transfer to the National Archives of the United States of records of a Federal agency that have been in existence for more than thirty years and determined by the Archivist . . . to have sufficient historical or other value to warrant their continued preservation." *Id.* § 2103(2) (Supp. V 1981).[77]

### D. *Conclusion*

The district court's June 9, 1981, order directed the FBI to allow NARS inspection of files and records covered by the January 10, 1980, injunction. We agree with the government's contention that three catego-ries of records in the FBI's possession—tax returns and tax return information, grand jury materials, and electronic surveillance materials—fall within the statutory description, "[r]ecords, the use of which is restricted by law." 44 U.S.C. § 2906(a)(2). Further, we find within the relevant laws restricting the use of records no exception for records management inspection by NARS. As we read section 2906(a)(2), NARS inspection of the records at issue is conditioned upon approval by the FBI director or the President. The requisite approval has not been granted. We therefore hold that the district court exceeded its authority by ordering a NARS records management review of these three categories of records.

For the reasons stated in Parts I–V, the district court's orders of June 9 and July 1, 1981 are affirmed insofar as they accord with our instructions and explanation in Part V.C.4.

For the reasons stated in Part VI, the district court's October 20, 1982, order is reversed insofar as it requires the FBI to permit NARS to inspect, for records management purposes, tax returns and tax return information, grand jury materials, and electronic surveillance [Title III] materials.

*It is so ordered.*

VAN PELT, Senior District Judge, concurring:

My colleagues have written well in the preparing of this opinion with which I concur. I do not attempt to improve upon their language or add to the scholarship which is evident to any reader. I choose only to express certain concerns and the belief that the FBI and other defendants can live with this opinion.

---

returns and return information are Internal Revenue Service records; accordingly, the requisite approval would have to come from court or the IRS. Government's Supplemental Brief at 16 n. 8. Congress did not define "head of the agency concerned." Prior to the 1976 Federal Records Management Amendments, § 2906 conditioned inspection of restricted use records upon the "approval of the head of the *custodial* agency." Act of Oct. 22, 1968, Pub.Law No. 90–620, § 2906, 82 Stat. 1238, 1297 (amended 1976) (emphasis added). We find no indication that in 1976, when Congress dropped the word "custodial" from § 2906, it intended to give a different meaning to the words "head of the agency."

**77.** "When records, the use of which is subject to statutory limitations and restrictions, are . . . transferred [to the National Archives], permissive and restrictive statutory provisions with respect to the examination and use of records applicable to the head of the agency from which the records were transferred or to employees of that agency are applicable [to NARS personnel]." 44 U.S.C. § 2104.

First of all, it is to be noted that the inspection by NARS of all records of which disposal is to be had is permissive. NARS is not required to inspect all the records. It does have a duty to conduct a critical examination of disposal schedules and procedures. We are holding that the tendered disposal schedules should provide a reasoned justification for record destruction. We hold the trial judge was correct in his evaluation of the schedules before him. Although his ruling might appear burdensome, I believe it was justified by the facts of this case. Our decision here today helps to clarify the duties assigned to NARS and its relationship with the federal agencies. As a result, conflicts such as those at issue in this case may be avoided in the future.

I would mention that if the schedules hereafter to be furnished are sufficiently detailed, NARS, in my opinion, may be able to satisfy its mandate without actual inspection.

While all cases and their records are important, I make particular mention of the tax records, grand jury proceedings, and electronic surveillance records. These records do fall under and are governed by Section 2906(a)(2). NARS' management of these records is limited. My concurrence is based upon the belief that NARS' inspection can only occur with the approval of the agency head or the President. It seems apparent that if the President thought a record or document should be restricted for reasons of national security or public interest and an agency head disagreed and tried to disregard a President's views of national security or the public interest, termination of the agency head's authority could and would be sure and certain and sufficient to ensure that irreparable harm would not occur.

I do not read into this law any intention on the part of the Congress to make easy the second-guessing of Judges like Irving R. Kaufman who have conscientiously made rulings which do not satisfy descendants of some of the parties, or to further overwork certain overworked agencies such as the FBI, or embarrass or punish its director whose work has been a source of pride to the judiciary from which he came.

Rather, I believe this opinion strengthens departmental and presidential control, places sensitive records outside NARS' jurisdiction and assists the Congress in answering satisfactorily the problems with which it was confronted, namely the handling of records, the use of which is and should be restricted.